STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
PETER K. SHACK AND FRANK TEJERAS, DEFEND-
ANTS-APPELLANTS.

Argued March 8 and 9, 1971—Decided May 11, 1971.

298

*Mr. Max B. Rothman* argued the cause for appellants (*Mr. David H. Dugan, III,* Camden Regional Legal Services, Inc., attorney; *Mr. Peter K. Shack* and *Mr. Christian B. Peper, Jr.,* of the Missouri bar, on the brief).

*Mr. Samuel J. Serata,* Assistant Prosecutor, argued the cause for respondent (*Mr. Joseph Tuso,* Cumberland County Prosecutor, attorney).

*Mr. Barry H. Evenchick,* Deputy Attorney General, argued the cause for the Attorney General of New Jersey, *amicus*

*curiae* (*Mr. George F. Kugler, Jr.,* Attorney General of New Jersey).

*Mr. Carl R. Lobel* argued the cause for New Jersey State Office of Legal Services, *amicus curiae* (*Mr. Carl F. Bianchi,* attorney).

*Mr. Frederick B. Lacey,* United States Attorney, submitted a brief on behalf of the United States, *amicus curiae* (*Mr. Jerris Leonard,* Assistant Attorney General, *Mr. David L. Norman,* Deputy Assistant Attorney General, and *Mr. Joseph B. Scott,* attorney, U. S. Department of Justice, of the D. C. bar, on the brief).

The opinion of the Court was delivered by

WEINTRAUB, C. J. Defendants entered upon private property to aid migrant farmworkers employed and housed there. Having refused to depart upon the demand of the owner, defendants were charged with violating *N. J. S. A.* 2A:170-31 which provides that "[a]ny person who trespasses on any lands * * * after being forbidden so to trespass by the owner * * * is a disorderly person and shall be punished by a fine of not more than $50." Defendants were convicted in the Municipal Court of Deerfield Township and again on appeal in the County Court of Cumberland County on a trial *de novo. R.* 3:23-8(a). We certified their further appeal before argument in the Appellate Division.

Before us, no one seeks to sustain these convictions. The complaints were prosecuted in the Municipal Court and in the County Court by counsel engaged by the complaining landowner, Tedesco. However Tedesco did not respond to this appeal, and the county prosecutor, while defending abstractly the constitutionality of the trespass statute, expressly disclaimed any position as to whether the statute reached the activity of these defendants.

Complainant, Tedesco, a farmer, employs migrant workers for his seasonal needs. As part of their compensation, these workers are housed at a camp on his property.

Defendant Tejeras is a field worker for the Farm Workers Division of the Southwest Citizens Organization for Poverty Elimination, known by the acronym SCOPE, a nonprofit corporation funded by the Office of Economic Opportunity pursuant to an act of Congress, 42 *U. S. C. A.* §§ 2861–2864. The role of SCOPE includes providing for the "health services of the migrant farm worker."

Defendant Shack is a staff attorney with the Farm Workers Division of Camden Regional Legal Services, Inc., known as "CRLS," also a nonprofit corporation funded by the Office of Economic Opportunity pursuant to an act of Congress, 42 *U. S. C. A.* § 2809(a)(3). The mission of CRLS includes legal advice and representation for these workers.

Differences had developed between Tedesco and these defendants prior to the events which led to the trespass charges now before us. Hence when defendant Tejeras wanted to go upon Tedesco's farm to find a migrant worker who needed medical aid for the removal of 28 sutures, he called upon defendant Shack for his help with respect to the legalities involved. Shack, too, had a mission to perform on Tedesco's farm; he wanted to discuss a legal problem with another migrant worker there employed and housed. Defendants arranged to go to the farm together. Shack carried literature to inform the migrant farmworkers of the assistance available to them under federal statutes, but no mention seems to have been made of that literature when Shack was later confronted by Tedesco.

Defendants entered upon Tedesco's property and as they neared the camp site where the farmworkers were housed, they were confronted by Tedesco who inquired of their purpose. Tejeras and Shack stated their missions. In response, Tedesco offered to find the injured worker, and as to the worker who needed legal advice, Tedesco also offered to locate the man but insisted that the consultation would have to take place in Tedesco's office and in his presence. Defendants declined, saying they had the right to see the men

in the privacy of their living quarters and without Tedesco's supervision. Tedesco thereupon summoned a State Trooper who, however, refused to remove defendants except upon Tedesco's written complaint. Tedesco then executed the formal complaints charging violations of the trespass statute.

I

The constitutionality of the trespass statute, as applied here, is challenged on several scores.

It is urged that the First Amendment rights of the defendants and of the migrant farmworkers were thereby offended. Reliance is placed on *Marsh v. Alabama, 326 U. S. 501, 66 S. Ct. 276, 90 L. Ed. 265* (1946), where it was held that free speech was assured by the First Amendment in a company-owned town which was open to the public generally and was indistinguishable from any other town except for the fact that the title to the property was vested in a private corporation. Hence a Jehovah's Witness who distributed literature on a sidewalk within the town could not be held as a trespasser. Later, on the strength of that case, it was held that there was a First Amendment right to picket peacefully in a privately owned shopping center which was found to be the functional equivalent of the business district of the company-owned town in *Marsh. Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., 391 U. S. 308, 88 S. Ct. 1601, 20 L. Ed. 2d 603* (1968). See, to the same effect, the earlier case of *Schwartz-Torrance Investment Corp. v. Bakery and Confectionery Workers' Union, 61 Cal 2d 766, 40 Cal Rptr. 233, 394 P. 2d 921* (Sup. Ct. 1964), *cert.* denied, *380 U. S. 906, 85 S. Ct. 888, 13 L. Ed. 2d 794* (1964). Those cases rest upon the fact that the property was in fact opened to the general public. There may be some migrant camps with the attributes of the company town in *Marsh* and of course they would come within its holding. But there is nothing of that character in the case before us, and hence there would have to be an extension of *Marsh* to embrace the immediate situation.

Defendants also maintain that the application of the trespass statute to them is barred by the Supremacy Clause of the United States Constitution, *Art.* VI, *cl.* 2, and this on the premise that the application of the trespass statute would defeat the purpose of the federal statutes, under which SCOPE and CRLS are funded, to reach and aid the migrant farmworker. The brief of the United States, *amicus curiae,* supports that approach. Here defendants rely upon cases construing the National Labor Relations Act, 29 *U. S. C. A.* § 151 *et seq.,* and holding that an employer may in some circumstances be guilty of an unfair labor practice in violation of that statute if the employer denies union organizers an opportunity to communicate with his employees at some suitable place upon the employer's premises. See *NLRB v. Babcock and Wilcox Co.,* 351 *U. S.* 105, 76 *S. Ct.* 679, 100 *L. Ed.* 975 (1956), and annotation, 100 *L. Ed.* 984 (1956). The brief of New Jersey State Office of Legal Services, *amicus curias,* asserts the workers' Sixth Amendment right to counsel in criminal matters is involved and suggests also that a right to counsel in civil matters is a "penumbra" right emanating from the whole Bill of Rights under the thinking of *Griswold v. Connecticut,* 381 *U. S.* 479, 85 *S. Ct.* 1678, 14 *L. Ed.* 2d 510 (1965), or is a privilege of national citizenship protected by the privileges and immunities clause of the Fourteenth Amendment, or is a right "retained by the people" under the Ninth Amendment, citing a dictum in *United Public Workers v. Mitchell,* 330 *U. S.* 75, 94, 67 *S. Ct.* 556, 91 *L. Ed.* 754, 770 (1947).

 These constitutional claims are not established by any definitive holding. We think it unnecessary to explore their validity. The reason is that we are satisfied that under our State law the ownership of real property does not include the right to bar access to governmental services available to migrant workers and hence there was no trespass within the meaning of the penal statute. The policy considerations which underlie that conclusion may be much the same as those which would be weighed with respect to one or more

of the constitutional challenges, but a decision in nonconstitutional terms is more satisfactory, because the interests of migrant workers are more expansively served in that way than they would be if they had no more freedom than these constitutional concepts could be found to mandate if indeed they apply at all.

II

Property rights serve human values. They are recognized to that end, and are limited by it. Title to real property cannot include dominion over the destiny of persons the owner permits to come upon the premises. Their well-being must remain the paramount concern of a system of law. Indeed the needs of the occupants may be so imperative and their strength so weak, that the law will deny the occupants the power to contract away what is deemed essential to their health, welfare, or dignity.

Here we are concerned with a highly disadvantaged segment of our society. We are told that every year farmworkers and their families numbering more than one million leave their home areas to fill the seasonal demand for farm labor in the United States. *The Migratory Farm Labor Problem in the United States* (1969 Report of Subcommittee on Migratory Labor of the United States Senate Committee on Labor and Public Welfare), *p.* 1. The migrant farmworkers come to New Jersey in substantial numbers. The report just cited places at 55,700 the number of man-months of such employment in our State in 1968 (*p.* 7). The numbers of workers so employed here in that year are estimated at 1,300 in April; 6,500 in May; 9,800 in June; 10,600 in July; 12,100 in August; 9,600 in September; and 5,500 in October (*p.* 9).

The migrant farmworkers are a community within but apart from the local scene. They are rootless and isolated. Although the need for their labors is evident, they are unorganized and without economic or political power. It is their plight alone that summoned government to their aid.

In response, Congress provided under Title III–B of the Economic Opportunity Act of 1964 (42 *U. S. C. A.* § 2701 *et seq.*) for "assistance for migrant and other seasonally employed farmworkers and their families." Section 2861 states "the purpose of this part is to assist migrant and seasonal farmworkers and their families to improve their living conditions and develop skills necessary for a productive and self-sufficient life in an increasingly complex and technological society." Section 2862(b)(1) provides for funding of programs "to meet the immediate needs of migrant and seasonal farmworkers and their families, such as day care for children, education, health services, improved housing and sanitation (including the provision and maintenance of emergency and temporary housing and sanitation facilities), legal advice and representation, and consumer training and counseling." As we have said, SCOPE is engaged in a program funded under this section, and CRLS also pursues the objectives of this section although, we gather, it is funded under § 2809 (a) (3), which is not limited in its concern to the migrant and other seasonally employed farmworkers and seeks "to further the cause of justice among persons living in poverty by mobilizing the assistance of lawyers and legal institutions and by providing legal advice, legal representation, counseling, education, and other appropriate services."

These ends would not be gained if the intended beneficiaries could be insulated from efforts to reach them. It is in this framework that we must decide whether the camp operator's rights in his lands may stand between the migrant workers and those who would aid them. The key to that aid is communication. Since the migrant workers are outside the mainstream of the communities in which they are housed and are unaware of their rights and opportunities and of the services available to them, they can be reached only by positive efforts tailored to that end. *The Report of the Governor's Task Force on Migrant Farm Labor* (1968) noted that "One of the major problems related to seasonal farm

labor is the lack of adequate direct information with regard to the availability of public services," and that "there is a dire need to provide the workers with basic educational and informational material in a language and style that can be readily understood by the migrant" (*pp.* 101–102). The report stressed the problem of access and deplored the notion that property rights may stand as a barrier, saying "In our judgment, 'no trespass' signs represent the last dying remnants of paternalistic behavior" (*p.* 63).

A man's right in his real property of course is not absolute. It was a maxim of the common law that one should so use his property as not to injure the rights of others. *Broom, Legal Maxims* (10th ed. Kersley 1939), *p.* 238; 39 *Words and Phrases, "Sic Utere Tuo ut Alienum Non Laedas,"* *p.* 335. Although hardly a precise solvent of actual controversies, the maxim does express the inevitable proposition that rights are relative and there must be an accommodation when they meet. Hence it has long been true that necessity, private or public, may justify entry upon the lands of another. For a catalogue of such situations, see *Prosser, Torts* (3d ed. 1964), § 24, *pp.* 127–129; 6A *American Law of Property* (A. J. Casner ed. 1954) § 28.10, *p.* 31; 52 *Am. Jur., "Trespass,"* §§ 40–41, *pp.* 867–869. See also *Restatement, Second, Torts* (1965) §§ 197–211; *Krauth v. Geller,* 31 *N. J.* 270, 272–273 (1960).

The subject is not static. As pointed out in 5 *Powell, Real Property* (Rohan 1970) § 745, *pp.* 493–494, while society will protect the owner in his permissible interests in land, yet

"* * * [S]uch an owner must expect to find the absoluteness of his property rights curtailed by the organs of society, for the promotion of the best interests of others for whom these organs also operate as protective agencies. The necessity for such curtailments is greater in a modern industrialized and urbanized society than it was in the relatively simple American society of fifty, 100, or 200 years ago. The current balance between individualism and dominance of the social interest depends not only upon political and social ideologies, but also upon the physical and social facts of the time and place under discussion."

Professor Powell added in § 746, *pp.* 494–496:

"As one looks back along the historic road traversed by the law of land in England and in America, one sees a change from the viewpoint that he who owns may do as he pleases with what he owns, to a position which hesitatingly embodies an ingredient of stewardship; which grudgingly, but steadily, broadens the recognized scope of social interests in the utilization of things. * * *

To one seeing history through the glasses of religion, these changes may seem to evidence increasing embodiments of the golden rule. To one thinking in terms of political and economic ideologies, they are likely to be labeled evidences of 'social enlightment,' or of 'creeping socialism' or even of 'communistic infiltration,' according to the individual's assumed definitions and retained or acquired prejudices. With slight attention to words or labels, time marches on toward new adjustments between individualism and the social interests."

This process involves not only the accommodation between the right of the owner and the interests of the general public in his use of his property, but involves also an accommodation between the right of the owner and the right of individuals who are parties with him in consensual transactions relating to the use of the property. Accordingly substantial alterations have been made as between a landlord and his tenant. See *Reste Realty Corp. v. Cooper,* 53 *N. J.* 444, 451–453 (1969); *Marini v. Ireland,* 56 *N. J.* 130, 141–143 (1970).

The argument in this case understandably included the question whether the migrant worker should be deemed to be a tenant and thus entitled to the tenant's right to receive visitors, *Williams v. Lubbering,* 73 *N. J. L.* 317, 319–320 (Sup. Ct. 1906), or whether his residence on the employer's property should be deemed to be merely incidental and in aid of his employment, and hence to involve no possessory interest in the realty. See *Scottish Rite Co. v. Salkowitz,* 119 *N. J. L.* 558 (E. & A. 1938); *New Jersey Midland Ry. Co. v. Van Syckle,* 37 *N. J. L.* 496, 506 (E. & A. 1874); *Gray v. Reynolds,* 67 *N. J. L.* 169 (Sup. Ct. 1901); *McQuade v. Emmons,* 38 *N. J. L.* 397 (Sup. Ct. 1876); *Morris Canal & Banking Co. v. Mitchell,* 31 *N. J. L.* 99 (Sup. Ct. 1864);

*Schuman v. Zurawell,* 24 *N. J. Misc.* 180 (Cir. Ct. 1946). These cases did not reach employment situations at all comparable with the one before us. Nor did they involve the question whether an employee who is not a tenant may have visitors notwithstanding the employer's prohibition. Rather they were concerned with whether notice must be given to end the employee's right to remain upon the premises, with whether the employer may remove the discharged employee without court order, and with the availability of a particular judicial remedy to achieve his removal by process. We of course are not concerned here with the right of a migrant worker to remain on the employer's property after the employment is ended.

We see no profit in trying to decide upon a conventional category and then forcing the present subject into it. That approach would be artificial and distorting. The quest is for a fair adjustment of the competing needs of the parties, in the light of the realities of the relationship between the migrant worker and the operator of the housing facility.

Thus approaching the case, we find it unthinkable that the farmer-employer can assert a right to isolate the migrant worker in any respect significant for the worker's well-being. The farmer, of course, is entitled to pursue his farming activities without interference, and this defendants readily concede. But we see no legitimate need for a right in the farmer to deny the worker the opportunity for aid available from federal, State, or local services, or from recognized charitable groups seeking to assist him. Hence representatives of these agencies and organizations may enter upon the premises to seek out the worker at his living quarters. So, too, the migrant worker must be allowed to receive visitors there of his own choice, so long as there is no behavior hurtful to others, and members of the press may not be denied reasonable access to workers who do not object to seeing them.

It is not our purpose to open the employer's premises to the general public if in fact the employer himself has not

done so. We do not say, for example, that solicitors or peddlers of all kinds may enter on their own; we may assume for the present that the employer may regulate their entry or bar them, at least if the employer's purpose is not to gain a commercial advantage for himself or if the regulation does not deprive the migrant worker of practical access to things he needs.

And we are mindful of the employer's interest in his own and in his employees' security. Hence he may reasonably require a visitor to identify himself, and also to state his general purpose if the migrant worker has not already informed him that the visitor is expected. But the employer may not deny the worker his privacy or interfere with his opportunity to live with dignity and to enjoy associations customary among our citizens. These rights are too fundamental to be denied on the basis of an interest in real property and too fragile to be left to the unequal bargaining strength of the parties. See *Henningsen v. Bloomfield Motors, Inc.,* 32 *N. J.* 358, 403–404 (1960); *Ellsworth Dobbs, Inc. v. Johnson,* 50 *N. J.* 528, 555 (1967).

It follows that defendants here invaded no possessory right of the farmer-employer. Their conduct was therefore beyond the reach of the trespass statute. The judgments are accordingly reversed and the matters remanded to the County Court with directions to enter judgments of acquittal.

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For affirmance*—None.