135 N.J. Super. 297 (1975)
343 A.2d 148
STEVEN FREEDMAN AND ROBERT DURREL, PLAINTIFFS,
v.
NEW JERSEY STATE POLICE, SEBASTIAN "BENNY" A. SORBELLO, ET AL, DEFENDANTS.
Superior Court of New Jersey, Law Division.
June 26, 1975.
*298 Ms. Margaret M. Hayden for plaintiffs (American Civil Liberties Union).
Mr. John Tomasello for defendant Sebastian "Benny" A. Sorbello (Messrs. Tomasello & Driscoll, attorneys).
MILLER, J.C.C., Temporarily Assigned.
This summary judgment motion concerns itself with the rights of newspaper reporters to visit and interview migrant farm laborers living in housing provided on a farm by the farmer. Manifestly *299 there are likewise involved the rights of the farmer who provides such housing and there must be delimited the scope of legitimate public inquiry with relationship to rights of privacy to which the farmer is entitled. The facts have been stipulated and all remaining factual and legal issues were disposed of at earlier stages of the original suit.
Plaintiffs Freedman and Durrel were students at Princeton University. Freedman was a reporter and Durrel a photographer for the Daily Princetonian, the university newspaper. Seeking to write an article about migrant farmworkers in South Jersey, they contacted Douglas Jones, an investigator in the Farmworkers Division of Camden Regional Legal Services for assistance in acquainting themselves with the farmworkers and their problems.
On May 15, 1973 plaintiffs and Jones proceeded to the farm of defendant Sorbello for the purpose of seeking out migrant labor camp conditions. (Two research analysts from the U.S. Labor Department's Bureau of Standards were also present doing random checks on work conditions on the farm; whether their presence was significant or not is unexplained.) Upon arriving at the migrant labor camp site located on the Sorbello farm, Jones went to look for defendant Sorbello to seek his cooperation while the rest of the party remained at the camp site.
While waiting Durrel began taking pictures of the camp site and of defendant. Sorbello demanded that Durrel cease and surrender to him the film. When plaintiffs refused, defendant called the police. A member of the New Jersey State Police responded and requested that the two rolls of film involved be turned over to him. Plaintiffs surrendered the film but maintained that they had a right to keep it. The film at present is in the possession of a municipal magistrate pending the disposition of this suit.
Manifestly there is required here a refinement of the principles enunciated in State v. Shack, 58 N.J. 297 (1971). Sorbello in his argument seeks to limit the access permitted in Shack to "governmental services"; Freedman and Durrel *300 seek to embed the press within the penumbra of Shack. They rely on the first amendment to the Federal Constitution although this is entirely unnecessary. The N.J. Const. (1947) Art. 1, par. 6, affords identical rights as does the Federal Constitution. It seems unnecessary to invoke federal authority when the protection of our New Jersey system is more than adequate. Cf. National Freight v. Ostroff, 133 N.J. Super. 554, 558 (Law Div. 1975). As a matter of fact, the declaration of rights and privileges in the New Jersey Constitution is far more complete and extensive than its federal counterpart. See, for example, Art. 1, par. 19.
One wonders why parties routinely and without reflection attach themselves to federal constitutional provisions, disregarding identical, and frequently more liberal principles of state constitutions. Anyone who compares the Bill of Rights of the Federal Constitution with the declaration of rights and privileges of the New Jersey Constitution will inexorably be drawn to the conclusion that the State Constitution provides greater protection to individual rights and liberties than the federal. Moreover, there is no tenable thesis that the federal judiciary is more capable of exercising its functions than is the judiciary of this State. This matter, therefore, will be treated as within the scope of the New Jersey constitutional periphery and not of the Federal Constitution, the applicability of which is redundant.
In Shack the Supreme Court required access to farm workers by representatives of "federal, State or local services, or from recognized charitable groups." Shack, 58 N.J. supra at 307. To this was added visitors of the worker's choice and members of the press.
Sorbello does not deny this but points out that the access of the press must be "reasonable" and asks this court to define what is reasonable and to provide guidelines for such access. He points out that the farmer in question has not opened his land to the public; that the visit in question was disruptive and without the ambit of Shack and, being without notice and during the business day, was unreasonable.
*301 It is impossible not to feel sympathetic with the farmer in this case. While the Daily Princetonian may be a legitimate member of what plaintiffs call the "non-establishment press" (whatever that is), and there is no doubt that its reporters and other authorized representatives are entitled to, and are, accorded status as legitimate reporters, see Lee v. Board of State Colleges, 306 F. Supp. 1097 (W.D. Wis., 1969), aff'd 441 F.2d 1257 (7 Cir.1971); Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); Stanford Daily v. Zurcher, 353 F. Supp. 124 (N.D. Cal. 1972), neither the law nor its courts operate in a vacuum. The Daily Princetonian is a newspaper primarily for the students and faculty of Princeton University. Merely to compare it with such newspapers as the New York Times, the Philadelphia Inquirer, or, in a slightly different field, Time Magazine or Newsweek, is to demonstrate the difference. The Daily Princetonian is, in the vernacular, a "house organ," having a limited appeal to its particular constituency. It is decidedly not a newspaper of general circulation. When a farmer sees representatives of such a publication invade his property, unannounced and accompanied by a lawyer during the normal hours of work, it is completely understandable why he loses his temper and judgment. The court believes that these young people were more interested in creating news than they were in reporting it.
Nevertheless, the farmer cannot prevail. Granted that the privileges of the press were strained, if not actually abused, the fact remains that the scope of the constitutional protection of Art. I, par. 6, encompasses the representatives of the Daily Princetonian.
This farmer and those who provide housing for persons other than their own families, be they tenants, licensees, migrant laborers or whatever status they may enjoy, must recognize that one who today provides such housing is sailing in waters that have been clearly charted as within the public interest. The statute books are replete with examples demonstrating that one who resides on the property of another is *302 accorded rights and privileges that would have been undreamed of half a century ago. To recite all such authorities would be burdensome, but a mere examination of such statutes as the Fair Eviction Notice Act, N.J.S.A. 2A:42-10.15 et seq., the provisions dealing with civil actions for re-entry, N.J.S.A. 2A:42-10.1 et seq., N.J.S.A. 2A:42-10.16, the statute dealing with security deposits, N.J.S.A. 46:8-21.1, and other similar acts demonstrates with clarity the proposition that it is the public policy of this State that the furnishing of lands and buildings for dwelling purposes by the owner to another constitutes an activity the regulation of which is as much in the public interest as the regulation of public utilities. The farmer may have a constitutional right to employ those whom he chooses, but he does not, if he chooses to house such employees, have a constitutional right to act in disregard of public policies hereinabove expressed or of his employees to assert their own rights.
The farmer is not entirely helpless, however. As Shack points out, these rights of the workers (and of the press or other visitors) must be exercised reasonably. Here, while the rights of the press may be recognized, these rights were exercised unreasonably. A minimum framework within which such rights must be exercised reasonably embrace: (1) the visiting of workers during nonworking hours (lunch included). (It must be recalled that farming is a seasonal occupation and the farmer ought not to be compelled to sit by and have his production disrupted. No one would pretend that the press should be able to stop an automobile assembly line (in media res) to interview workmen whom it could easily interview after hours); (2) a giving of reasonable notice to the farmer; (3) a confinement of such visitation and interview rights to the tenants themselves and the area where they live and work. (The worker's kitchen might be the subject of legitimate inquiry; the farmer's kitchen is not unless he feeds the tenants out of it); (4) consent of the interviewees, freely given, free from pressure from anyone, including the interviewer and the farmer.
*303 Manifestly, where a reporter can go, his photographer can go. The courts will not attempt to inhibit either; the constitutional cloak covers both.
In the instant case, both parties acted without guidelines. The narrow issue presented is whether the photographs taken must be destroyed or returned. They must be returned as improperly withheld. No costs.