787 A.2d 198 (2001)
346 N.J. Super. 107
In the Matter of the ESTATE OF Arthur J. ROCCAMONTE, Sr.
Mary Sopko, Plaintiff-Appellant,
v.
Estate of Arthur J. Roccamonte, Sr. Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted October 1, 2001.
Decided November 28, 2001.
*199 Michael J. Breslin, Jr., Hackensack and John M. Breslin, Paramus, attorneys for appellant (Michael J. Breslin, Jr., of counsel and, with Diana Ferriero, on the brief).
Joel C. Seltzer, Union, attorney for respondent.
Before Judges KESTIN, STEINBERG and ALLEY.
The opinion of the court was delivered by KESTIN, J.A.D.
In a prior opinion in this matter, In re Estate of Roccamonte, 324 N.J.Super. 357, 735 A.2d 614 (App.Div.1999) (Roccamonte I), we determined that the trial court erred in granting summary judgment to the Estate of Arthur A. Roccamonte (defendant) and dismissing Mary Sopko's (plaintiff's) contract-based cause of action for lifetime support. We held that plaintiff was entitled to a plenary proof opportunity on her various contract claims, "most significantly... an independent ground for the relief sought .... that, on the basis of principles established in Kozlowski v. Kozlowski, 80 N.J. 378, 403 A.2d 902 (1979); see also Crowe v. De Gioia, 90 N.J. 126, 447 A.2d 173 (1982) [Crowe I], she had a valid and enforceable contract claim with independent vitality, assertable against the decedent's estate as his successor in interest[.]" Roccamonte I, supra, 324 N.J.Super. at 365, 735 A.2d 614. See also Crowe v. DeGioia, 203 N.J.Super. 22, 495 A.2d 889 (App.Div.1985), aff'd o.b., 102 N.J. 50, 505 A. 2d 591 (1986) (Crowe II).
We remanded in accordance with a venue determination we also made. The matter was tried in the Probate Part of the Chancery Division, as directed. The trial court held that plaintiff had not satisfied the legal standards for prevailing and dismissed the complaint. Our review discloses that determination to have been erroneous. Accordingly, we vacate the judgment of dismissal and remand for the entry of judgment in favor of plaintiff on the contract claim with such damages as the trial court may calculate as appropriate based upon the record already made.
*200 In Roccamonte I, id. at 361-62, 447 A.2d 173, we set out the motion judge's earlier recitation of undisputed facts in making his summary judgment disposition:
Arthur A. Roccamonte, (Decedent) was a sophisticated business person. Decedent was married to Elise Roccamonte (Elise) until his death on March 14, 1995. Decedent was survived by Elise and his two children, Doreen Stackman (Doreen) and Arthur Roccamonte, Jr. (Arthur Jr.). Decedent died intestate and Doreen was granted ... letters of administration.
The present issue arises from the fact that although Decedent was married, he lived and maintained a relationship with Mary [Plaintiff] for approximately the last thirty years of his life. Decedent lived with Mary in a co-op apartment in Glen Ridge, New Jersey[,] which Decedent purchased for $15,000 in 1973. At the start of their relationship, Mary was also married but soon thereafter obtained a divorce. Decedent, however, remained married. Decedent told Mary that he could not marry her because Elise would not divorce him for reasons having to do with the family business. Although Decedent remained married, Mary states that Decedent repeatedly told her personally and in the presence of others that "I will take care of you" or "you will be taken care of" for the rest of your life. According to Mary, Decedent lavishly supported her and her daughter, Sandra Sopko, during the entire relationship. In return, Mary states that she provided services consistent with that of a housewife. Mary states that the statements became more frequent during the past ten years in which Decedent suffered from throat cancer.
As proof of Decedent's intent to "take care of" Mary, Mary states that Decedent bought her a wedding band and an engagement ring. Furthermore, Decedent published a notice in the New York Times on March 28, 1968[,] stating that he will not be responsible for Elise's debts. However, the Estate offers documents that show that Decedent filed his tax returns jointly with Elise until his death. Furthermore, both parties offer bits and pieces of the transcript of Mr. Neil Peters, Decedent's accountant (Peters), who testified that Decedent was aware that he did not have a will and when it was recommended several times by Peters to make one, he would just avoid doing anything about it.
At Decedent's death, he left Mary the co-op apartment, an insurance policy worth $10,000, a certificate of deposit worth $18,000, jewelry approximately worth $25,000, and other personal items bought by Decedent for Mary.
The trial judge recited additional factual detail in his oral opinion rendered after the trial:
[I]n or about the mid 1960s[,] Mary left Arthur and went to California. Because even though they had lived together from time to time, Arthur had refused to get a divorce from his wife, despite requests from Mary.
While she lived in California with her sister, Mary testified that she received constant calls from Arthur. He promised her if she came back to New Jersey he would leave his wife. Subsequent events will show that he did not keep this promise, if it had been made. She claims that he promised that if she returned from California, he would take care of her financially.
Still during this time, she was married to Nicholas Sopko. Relying on his promise to leave his wife, Mary stated that she came back to New Jersey and lived in Glen Ridge. She divorced Nicholas Sopko in 1967. In 1973[,] Arthur *201 purchased a co-op at the Parkway House in Glen Ridge, No. 7A, and placed title in her name. Arthur moved [in with] her and continued to live with her until he died on March 14th, 1995.
During their live-in relationship, decedent bought Mary clothing, jewelry, furs, paid for dinners in upscale restaurants in New York City, and vacations to Atlantic City and Palm Springs. He apparently enjoy[ed] the sport of gambling. He also paid the monthly maintenance fee for the co-op, which was approximately $950 per month. He also gave Mary cash on a weekly basis, usually, which at times amounted to as much as $600.
She stated that when she lived with Arthur, she considered herself to be his "wife." She cleaned, cooked and accommodated him sexually. She stated he was like her husband. And all in all, the relationship was very good until he died.
The consideration for the purchase of the co-op was $15,000, which he paid in cash. He also paid for improvements to the co-op, and redid the entire kitchen. At any time the co-op needed some refurbishing, such as painting and papering, Arthur would also pay for that. Again, all payments were made in cash.
Mary and Arthur did not have any joint banking accounts. It was her contention that it was because Arthur did not "believe in them." During the time that they lived together Arthur did not speak to her about his business. However, it is evident that he was a sophisticated businessman who operated a trucking company in the garment district of New York.
Mary also stated that she had numerous conversations with Arthur about why he would not divorce his wife. She said that his replies were essentially that "I can't because she could get me in a lot of trouble." When she inquired as to the kind of trouble, Arthur told her "well, because of the business there could be a problem."
We also know that when Arthur died he left Mary not only with the co-op and the furnishings and contents therein, and such personal items as jewelry valued at $25,000, but a certificate of deposit in the amount of $10,000, plus an $18,000 life insurance policy.[1]
It was her further testimony that Arthur made promises to her that she would never have to worry about money as long as he was around, or even after he was gone, in that as long as she lived she would be taken care of. She believed that this meant that even if Arthur died and she survived him, which occurred, she would be taken care of for the rest of her life.
Mary's brother, John Treven, a witness at trial, testified that when questioned about whether he discussed with Arthur the subject of Arthur making a Will providing for Mary in the event of his death, Arthur would say in passing comment, don't worry about Mary. I will take care of her and that was it. There were other witnesses who testified about these passing comments.
Decedent knew the importance of making a Last Will and Testament, as testified to by his accountant. However, he never created such a document and died intestate. Throughout the many years together[,] Mary knew the decedent *202 was a very private man that always paid for things in cash. She knew that he did not have a bank account[,] and he was secretive about his business dealings.
She also conceded that she knew that Arthur did not make a Will, and obviously knew that he had never divorced his wife Elise.
The trial judge then went on to note plaintiff's position that she had "relied on decedent's verbal promise `to take care of her' even after Arthur's death."
The trial court's findings are supported by the evidence and are binding on review. Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 483-84, 323 A.2d 495 (1974). The judge did not find, however, that the alleged promise to provide for plaintiff for the rest of her life had not been made. Rather, the judge concluded "that this verbal promise does not entitle Mary to support on a theory of expressed or implied contract, unjust enrichment, a contract to make a will, or even palimony." He went on to analyze the various theories.
The judge, relying on Weichert Co. Realtors v. Ryan, 128 N.J. 427, 608 A.2d 280 (1992), explained that an express contract could not be found because of a lack of adequate definiteness in the essential terms. He found "[t]here was no writing manifesting an express intent to provide for Mary's future[,]" and held "[t]he words `I'll take care of you' have no contractual effect. There must be an offer and acceptance with definite terms so that performance can be rendered by each party. If the terms are deficient, there is no enforceable obligation."
He went on to opine:
If the terms are indefinite or incomplete, past dealings may be considered. However, in family type relationships, when one member of a family renders a form of service to another member of the family, it will not imply a promise to pay for such service. Doby v. Williams, 53 N.J.Super. 548, 148 A.2d 42 (Law Div.1959), Leitner v. Braen, 51 N.J.Super. 31, 143 A.2d 256 (App.Div.1958).
The question of contract frequently comes up in palimony matters where it has been held that no contract will be implied from the rendition of services by two individuals who are cohabiting, unless express contract exists. Rather, such services are inferred as being rendered freely and without expectation of pay or return. Morone v. Morone, 50 N.Y.2d 481, 429 N.Y.S.2d 592, 413 N.E.2d 1154 (1980); accord Young v. Carruth, 89 A.D.2d 466, 455 N.Y.S.2d 776 (1982), In re Estate of Lasek, 144 Misc.2d 813, 545 N.Y.S.2d 668 (Surr.Ct.1989), Friedman v. Friedman, 20 Cal.App.4th 876, 24 Cal.Rptr.2d 892, 898 (1993).
The Lasek Court rejected the words "I'll take care of her" ruling that it was too vague to constitute any meaningful promise. An implied contract was rejected, even though the decedent and his partner had lived 40 years together and wife services were supplied by plaintiff to the decedent before he died.
In Friedman, supra, the Court again in considering the words "I'll always support you" held that such words were insufficient to form either an expressed or implied, in fact, contract. Because there is no expressed agreement between the parties, and there was no business relationship, past conduct or external criterion to instruct us, the words are not specific enough to create a contract between the parties for future support. See also Taylor v. Polackwich, 145 Cal.App.3d 1014, 194 Cal. Rptr. 8 (1983). *203 Based on this analysis in the light of the findings he had made, the trial judge concluded "there was no express contract between Mary and the decedent." He did not specifically reflect on the theory of recovery based on implied contract as having any separate qualities.
The trial judge then turned to the "unjust enrichment/quasi-contract" element of plaintiff's claim. He noted the applicable rule of law:
The courts have held that "a defendant is obligated to pay for services rendered for it by plaintiff, if the circumstances are such that plaintiff reasonably expected defendant to compensate it, and if a reasonable person in defendant's position would know that plaintiff was performing the services in confidence that the defendant would pay for them." Wanaque Borough Sewage Auth. v. Township of W. Milford, 281 N.J.Super. 22, 30, 656 A.2d 448 (App. Div.1995) (citing Avery v. Sielcken-Schwarz, 5 N.J.Super. 195, 200, 68 A.2d 635 (App.Div.1949)).
The judge then went on to analyze the facts in the light of that rule:
In this case[,] Mary testified she did perform household chores for decedent, such as cooking and cleaning, but indicated that she never felt like she was working for Arthur. (Citation to record omitted.)
Plaintiff viewed the relationship as that of husband and wife and not as one of employer/employee. She further stated that decedent took care of her during the years of their relationship by giving her the aforementioned weekly amounts of cash, dinner, jewelry, clothing, furniture and vacations. She never viewed the relationship as a service contract. Under those circumstances it would seem that she should not, therefore, be awarded any damages under the theory of unjust enrichment.
The facts reveal that Arthur did not take advantage of the plaintiff or receive a benefit with the understanding that he was required to pay for that benefit. Mary apparently, although unhappy with the fact that Arthur had never divorced his wife, decided that she would remain in that situation. She knew he was not forthcoming in discussing personal matters with her. He never promised her that he would provide for her in his Will.
She liked the fact that she was enjoying a higher living standard than her job would pay for. She liked going to Atlantic City. She liked going to the fancy restaurants in New York. They enjoyed each other's companionship, and apparently had a loving relationship.
She knew that Arthur had two children by his wife. She, therefore, had to have known that there was a real risk that the wife and children would benefit if he died without a Will. She never insisted, nor did he promise to sign any kind of a contract to reassure what must have been in her mind constantly.
This was a man who kept to himself, decided things on his own terms, and she, for reasons best known to her, decided to go along with it when she had the opportunity to have terminated the relationship if she was not satisfied with the status quo.
On the issue of "contract to make a will or implied oral contract," the trial judge began by reciting the text of N.J.S.A. 3B:1-4. In pertinent part, the statute provides:
A contract to make a will or devise, or not to revoke a will or devise, or to die intestate, if executed after September 1, 1978, can be established only by (1) provisions of a will stating material provisions *204 of the contract; (2) an express reference in a will to a contract and extrinsic evidence proving the terms of the contract; or (3) a writing signed by the decedent evidencing the contract.
The judge went on to analyze the evidence in this regard:
The only statement or statements allegedly made by decedent were "I'll take care of you" or "don't worry, you'll be taken care of." These oral statements do not comply with the statute and do not constitute a contract to make a Will.
Additionally, Mary has produced no written instrument that purports to be a contract to support a claim under this statute. However, because the parties had a relationship and were living together prior to 1978, the Court must also look at the law regarding oral agreements at that time.
In Young v. Sabol, 4 N.J. 309, 312, 72 A.2d 846 (1950), the Court held that "the plaintiff was to prove by clear, cogent and convincing evidence an oral agreement on the part of the decedent, supported by a valuable consideration, and to prove that the agreement was mutual, definite and certain as to its terms and subject matter."
In this matter Mary does not meet the above standard. There were no definite terms discussed between the parties and the words "I'll take care of you" do not comply with the clear and convincing requirement. Further, Mary does not offer any evidence of valuable consideration given to the decedent.
The words "I'll take care of you" means what? Does it mean that you will be taken care of in the same standard of living as before or some lesser standard? Does it mean a certain prescribed amount of money? Does it mean that you will continue to go to fancy restaurants in New York or gamble in Atlantic City or Palm Springs? Does it mean that cash that was given from time to time, sometimes on a weekly basis, as much as $600, would also be given?
I think it is clear that these words are not capable of any definite or calculable meaning. Thus, the time frame of the statements made by the decedent does not affect the outcome and the Court's decision that there was no contract to make a Will.
The trial judge concluded his analysis by addressing plaintiff's "palimony" theory. He recalled "certain statements made by [plaintiff's counsel] which expressly stated or implied that she was no longer seeking recovery under this theory." Plaintiff, on appeal, disputes this characterization and asserts that she never abandoned her "palimony" claim. Our review of the record discloses that plaintiff is correct.
In considering the "palimony" theory, the judge observed:
The New Jersey courts have viewed the issue of palimony as a valid cause of action, but one that is limited and only to be applied in situations containing express agreements between the parties. Plaintiff refers to Kozlowski v. Kozlowski, 80 N.J. 378, 403 A.2d 902 (1979) and Crowe v. De Gioia, 90 N.J. 126, 447 A.2d 173 (1982) to support her claim, if any, for palimony.
This Court finds that these cases only support claims for palimony when there is an express contract between the parties, and therefore, do not support Mary's case.
In Kozlowski [,] the court found that the parties entered into an express contract for support and that the nature of the relationship was one of employer/employee. The trial court stated that "he would take care of her and provide for her if she would only come back and *205 resume her functions in the household as she had performed them in the past." Kozlowski v. Kozlowski, 164 N.J.Super. 162, 168-69, 395 A.2d 913 (Ch.Div.1978).
It should be remembered Mary never viewed her support by Mr. Roccamonte as being conditioned upon her performance of household duties or other wifely services for him. She indicated that he was like her husband and he took care of her, but offered no evidence of consideration on her part.
In Crowe the court found that there was also an express agreement between the parties that supported the request for palimony. Crowe, 203 N.J.Super. 22, 28, 495 A.2d 889 (App.Div.1985).
Again, for the reasons stated earlier, there is no evidence of any express agreement between the parties. It should be remembered that Mrs. Sopko had her own job, even though it may have been arranged through Arthur. She had her own money and accounts. The business that Arthur had he ran without any help from her. And he did not leave the plaintiff destitute, as is evidenced in Kozlowski and Crowe.

It would seem that in New Jersey to allow palimony it must be limited and must be narrowly applied and to be utilized only where there is an express agreement between the parties, almost complete dependency by one cohabitant on the other and the equitable element that one party has "tossed aside" the other unfairly. Here Arthur lived with Mary until his death.
Finally, the Court finds that the present matter can also be distinguished from Kozlowski and Crowe based on the fact that Mr. Roccamonte is deceased. As the trial court commented in Kozlowski, the oral agreement "would be terminated upon the death of either party". Kozlowski, 164 N.J.Super. at 178, 395 A.2d 913.
More recently, the trial court in Hendricks v. Richie, affirmed by the Appellate Court on February 15th, 2000, Docket No. A-1903-98T2,[2] agreed with the Kozlowski theory, stating that any agreement would terminate upon the death of the obligor. Consequently, if the plaintiff is still seeking recovery under the theory of palimony, such an action cannot be enforced.
On the basis of the foregoing approaches, the trial judge concluded:
It, therefore, appears that count one in which Mary sought permanent support for valuable services to Arthur during his lifetime, is dismissed. The second count alleging relief by way of unjust enrichment and quantum meruit theories [is] likewise dismissed.
Judgment was entered for defendant.
We concur in substantial part with the trial judge's determination that the evidence did not support a holding that the statutory or common law requirements for a contract to make a will or devise had been satisfied. And, we have no basis for questioning the judge's discretionary evaluation based upon the facts as he had found them that the tests for unjust enrichment/quasi-contract had not been met. We differ, however, with the trial judge's analysis regarding the legal tests for plaintiff's "palimony" claim, i.e., her theories of express or implied contract.
The trial judge erred in analyzing the matter as if the theories of express or implied contract were mutually exclusive *206 or on the basis that either of them could be considered separately from the "palimony" claim. A "palimony" claim is, by definition, based upon theories of express or implied oral contract. In Kozlowski, supra, 80 N.J. at 384, 403 A.2d 902, the Supreme Court observed:
Whether we designate the agreement reached by the parties in 1968 to be express, as we do here, or implied is of no legal consequence. The only difference is in the nature of the proof of the agreement. Parties entering this type of relationship usually do not record their understanding in specific legalese. Rather, as here, the terms of their agreement are to be found in their respective versions of the agreement, and their acts and conduct in the light of the subject matter and the surrounding circumstances.
Thus, the trial judge erred in relying on the cited out-of-state cases as support for a proposition at variance with the expressed rule and general purport of both Kozlowski and Crowe. Moreover, the underlying rationale employed by the trial judge is contrary to general rules of law. Professor Corbin's treatise states the generally accepted approach:
Contractual duty is imposed by reason of a promissory expression. As to this, there is no difference between an express contract and an implied contract. All contracts are express contracts, subject to the rules of contract law. * * * There are different modes of expressing assent. Expression may be by the tongue, the eye, the hand or by all of them at once. It may be by language, by words in any language, by words written or spoken. Yet there is also "sign language" which may consist of signs that are mere translations from a language of words, or of signs that convey ideas independently of any word language. A contract made by sign language is an express contract.
The language used to express assent, whether of words or of other signs and symbols, may be one invented by the parties themselves for their own private communications, or indeed for one communication only. They may use code words instead of English words or their own code, or the Morse code, or the Western Union telegraphic code. They may twist ordinary English words into code words, so that man signifies dog and tree signifies a thousand bushels of wheat. A contract made by a code communication is an express contract. Throwing up one's hat is usually an expression of joy; but it may be made to express assent to an agreement to sell land for ten thousand dollars.
From the above, it appears that, not only are all contracts express contracts, but also that all contracts are implied contracts.
[1 Corbin on Contracts § 1.19 (Perillo rev. ed.1993) (footnotes omitted).]
Accord Restatement (Second) of Contracts § 4 (1981); see also Troy v. Rutgers, 168 N.J. 354, 365-66, 774 A.2d 476 (2001); Wanaque Borough Sewerage Auth. v. Township of West Milford, 144 N.J. 564, 574, 677 A.2d 747 (1996) ("Contracts are traditionally classified as express, implied-in-fact or implied-in-law. The contract is express if the agreement is manifested by written or spoken words, and implied-in-fact if the agreement is manifested by other conduct.") (quoting Robert A. Long, Jr., Note, A Theory of Hypothetical Contract, 94 Yale L.J. 415, 415 n. 3 (1984)) (citation omitted).
Although the trial judge here decided that the facts he had found did not lead to a determination that an express or implied contract existed, those facts are remarkably similar to the facts found in *207 Kozlowski and Crowe. We conclude, based upon the rules and approaches applied in those cases, in the light of the facts found therein, that a contract of the same quality was created here, with terms no less express than the contracts in Kozlowski and Crowe. In each of those cases, the plaintiff's claim was based upon oral promises made during a relationship of long duration in which the parties lived together and functioned in every way, except for the existence of a marriage, as a family unit. In those cases, as here, the parties raised the claimants' children together. In Kozlowski and here, both parties were married to others when they began cohabiting, the plaintiff divorced her spouse, but the defendant never did while their relationship continued. The only significant difference between the parties' relationship here and in Crowe was that the defendant there was not married at the time the parties' relationship commenced. Here, as in Kozlowski and Crowe, the parties' relationship terminated before plaintiff made her "palimony" claim. It is of no special consequence that, in Kozlowski and Crowe, the end of the relationships came when the defendants left the plaintiffs; and that, here, the relationship ended with the death of the party to be charged. In both types of situation, the plaintiff sought to give legal effect to a promise to provide for her for the rest of her life, an undertaking which, if found to have occurred, gave rise to an "enforceable contract claim with independent vitality, assertable against the decedent's estate as his successor in interest[.]" Roccamonte I, supra, 324 N.J.Super. at 365, 735 A.2d 614.
The trial court's view of the standards governing "palimony" were overly narrow. The right to recover may be established by proof of an express or an implied agreement, made orally or in writing. We discern no requirement in either Kozlowski and Crowe that the claimant must prove, in the trial judge's terms, "almost complete dependency by one cohabitant on the other and the equitable element that one party has `tossed aside' the other unfairly." The cause of action discussed in Kozlowski and Crowe contains no such elements as a matter of definition. That those factual circumstances may have existed in both cases connotes only their qualities as equitable considerations to be assessed; they do not preclude the application of other legal or equitable considerations to reach the same result. We stress, particularly, that the "complete dependency" element articulated by the trial judge bespeaks reliance on the sufficiency of consideration, a factor expressly preluded in Crowe II, supra, 203 N.J.Super. at 31, 495 A.2d 889.
Furthermore, we discern nothing in Kozlowski and Crowe to suggest, as the trial judge held, that the contractually-based right cannot survive the death of the promisor. As with any other contract right not involving personal services, see United States Credit Sys. Co. v. Rosenbaum, 60 N.J.L. 294, 304, 37 A. 595 (Sup. Ct.1897), rev'd on other grounds, 61 N.J.L. 543, 40 A. 591 (E. & A. 1898); Cazares v. Saenz, 208 Cal.App.3d 279, 256 Cal. Rptr. 209, 212 (1989); Restatement (Second) of Contracts, § 262 cmt. b (1981), the claim for damages may be asserted against the promisor's estate as his successor in interest. See Roccamonte I, supra, 324 N.J.Super. at 365-66, 735 A.2d 614. A contract promisee's common law right to damages has no parallel in the statutory right to alimony.
In Kozlowski, the Supreme Court, as well as the trial judge, expressly determined there to be a sufficient basis in the facts established to conclude that a contract to provide for the promisee's life existed. "Such agreements by adult non-marital *208 partners ... are enforceable." Kozlowski, supra, 80 N.J. at 385, 403 A.2d 902.
We ... recognize that ... an agreement between adult parties living together is enforceable to the extent it is not based on a relationship proscribed by law, or on a promise to marry. Id. at 387, 403 A.2d 902.
In Crowe II, we were, of course, controlled by this rule, and we held further that, in such contracts, as in all others, "the amount and sufficiency of consideration is not significant, so long as it is the bargained for detriment actually intended as such between the parties." Crowe II, supra, 203 N.J.Super. at 31, 495 A.2d 889. We observed further that in both Kozlowski and Crowe "`the illicit equivalent of marital bliss' was part and parcel of the relationship between the parties." Ibid. (quoting trial court in Kozlowski, supra, 164 N.J.Super. at 167, 395 A.2d 913) (citation omitted). Our view in Crowe II was affirmed by the Supreme Court. See Crowe II, supra, 102 N.J. 50, 505 A.2d 591.
Kozlowski and Crowe declare a "promise[] to take care of [another] for the rest of her life" to be a valid basis for recovery on a contract claim. Crowe II, supra, 203 N.J.Super. at 32, 505 A.2d 591. We note again that the trial court here made no finding that no such promise had been made. Moreover, the record discloses no evidence countervailing plaintiff's proofs on the issue; nor did the trial judge make a credibility determination unfavorable to plaintiff. Rather, the judge held, contrary to Kozlowski and Crowe, that the promise made here was not actionable. This was incorrect. "So long as neither of the[ ] prohibitions [that the agreement is not based on a relationship proscribed by law, or on a promise to marry] is violated, it is clear that the court [in Kozlowski] intended to enforce agreements between unmarried parties[.]" Ibid.
As in Kozlowski and Crowe, the agreement plaintiff seeks to enforce is that embodying the promise to provide for her support for life. Unlike the claimant in Crowe, this plaintiff does not seek to enforce any other promise, such as that which led the court in Crowe II to order specific performance of a promise to convey the real property the parties had occupied together despite the contention that the oral agreement violated the Statute of Frauds, see id. at 33-34, 495 A.2d 889, or that which led to a denial of the plaintiff's claim for "equitable distribution." See id. at 36-37, 495 A.2d 889. As in Kozlowski and Crowe, this promisor, i.e., his estate, apparently remained capable of fulfilling the monetary obligation the contract entailed. In both of the seminal cases, the courts ordered a discharge of the obligation by a lump sum payment. See Kozlowski, supra, 80 N.J. at 388-89, 403 A.2d 902; Crowe II, supra, 203 N.J.Super. at 34-35, 495 A.2d 889. The trial court on remand should consider the appropriateness of such relief here.
Since Kozlowski, the principle at the basis of plaintiff's claim for relief has been firmly established in this State.
[T]he inability to fit plaintiff's claim for temporary relief into the conventional category of a matrimonial action is not a bar to relief. To achieve substantial justice in other cases, we have adjusted the rights and duties of parties in light of the realities of their relationship. See, e.g., McGlynn v. Newark Parking Authority, 86 N.J. 551, 559, 432 A.2d 99 (1981); State v. Shack, 58 N.J. 297, 307, 277 A.2d 369 (1971). Increasing numbers of unmarried couples live together. * * * Although plaintiff need not be rewarded for cohabiting with defendant, she should not be penalized simply because *209 she lived with him in consideration of a promise for support. Our endeavor is to shape a remedy that will protect the legally cognizable interests of the parties and serve the needs of justice. See generally Restatement (Second) of Contracts, § 359 at 169 (1981).

[Crowe I, supra, 90 N.J. at 135, 447 A.2d 173.]
Reversed and remanded for the entry of judgment in favor of plaintiff with damages to be determined by the trial court based upon the trial record already made.
STEINBERG, J.A.D., dissenting.
While I concur in the conclusion of the majority that the record did not support a holding that the requirements for a contract to make a will or devise had been satisfied, and that the judge did not mistakenly exercise his discretion in determining that the test for unjust enrichment/quasi-contract had not been met, I am constrained to respectfully dissent from that portion of the opinion regarding plaintiff's "palimony" claim. I agree with the majority that a "palimony" claim is, by definition, based upon theories of express or implied oral contract. For the following reasons, I also agree that the judge erred in concluding that a vague, illusory promise, such as the alleged promise made here, was insufficient to constitute a contract.
Ordinarily, a contract arises from an offer and acceptance which, in turn, "must be sufficiently definite `that the performance to be rendered by each party can be ascertained with reasonable certainty.'" Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435, 608 A.2d 280 (1992) (citation omitted). However, in the context of a "palimony" suit, a vague promise is sufficient to create a "palimony" obligation. Kozlowski v. Kozlowski, 80 N.J. 378, 387-88, 403 A.2d 902 (1979). Indeed, the promise made in Kozlowski was very similar to the promise allegedly made in this case. Mere uncertainty as to the amount of damages will not preclude recovery if there has been a wrong committed and there is certainty that some damages have resulted. Id. at 388, 403 A.2d 902. Thus, in the context of a "palimony" claim, a vague promise such as the one alleged to have been made here, "is enforceable to the extent it is not based on a relationship proscribed by law, or on a promise to marry." Id. at 387, 403 A.2d 902.
While I agree with the general proposition set forth by the majority that a contractual claim against a decedent may survive his death, I would not treat a "palimony" claim as a strict contract claim in considering whether the promise should survive the death of the obligor. Simply put, we run into difficulty when we attempt to place artificial labels on the facts before us. This is not an alimony claim. Nor is it a traditional contract claim. It is a "palimony" claim. However, I see no reason why a person entitled to "palimony" should be placed in a greater position than a person entitled to alimony. Just as an obligation to pay alimony terminates upon the death of the husband, Macfadden v. Macfadden, 46 N.J.Super. 242, 247, 134 A.2d 531 (Ch.Div.1957), aff'd, 49 N.J.Super. 356, 139 A.2d 774 (App. Div.), certif. denied, 27 N.J. 155, 141 A.2d 828 (1958), I would hold that the obligation to pay "palimony," although not technically alimony, likewise terminates upon the death of the obligor. Thus, I would affirm the judgment dismissing the complaint.
I also make the following observation. The majority concludes, and I agree, that the judge did not find that the alleged promise to provide for plaintiff for the rest of her life had not been made. Indeed, the judge made no finding at all on *210 that issue. At the very least, if a claim for "palimony" survives the death of the obligor, I would remand, pursuant to R. 1:7-4(a), for a specific finding as to whether the promise had been made. In addition, I would require the trial court, if it concluded that a promise had been made, to make a further determination as to when the promise was made, because I believe the claim is in the nature of a contention that Roccamonte agreed to provide for plaintiff by will. Consequently, if the alleged promise was made after September 1, 1978, plaintiff would have to establish its existence by (1) producing a will stating material provisions of the contract; (2) establishing an express reference in the will to a contract and extrinsic evidence proving the terms of the contract; or (3) providing a writing signed by Roccamonte evidencing the contract. See N.J.S.A. 3B:1-4. On the other hand, if the alleged promise was made on or before September 1, 1978, the statute would not apply. However, the alleged promise would still have to be established by clear and convincing proof. Young v. Sabol, 4 N.J. 309, 312, 72 A.2d 846 (1950) ("The obligation of plaintiff was to prove by clear, cogent and convincing evidence an oral agreement on the part of the decedent, supported by a valuable consideration, and to prove that the agreement was mutual, definite and certain as to its terms and subject matter.").
Even if the alleged promise is not considered to be an agreement to provide for plaintiff by will, the agreement would still have to be established by clear and convincing proof. See N.J.S.A. 2A:81-2 (requiring a party seeking to assert a claim against an estate based upon an oral promise to "establish the same by clear and convincing proof"). Because plaintiff is seeking to assert a claim based upon an oral representation she alleges decedent made, she must prove her contention by clear and convincing proof. Here, because the judge concluded that the promise was too vague to be enforced, he made no specific finding on the question of whether the promise had, in fact, been made. Thus, even if the alleged promise does survive Roccamonte's death, I believe a remand is necessary for a determination of whether the promise was made. At the remand proceedings, I would require plaintiff to establish her contention by clear and convincing proof.
In effect, the majority has exercised original jurisdiction, presumably pursuant to R. 2:10-5, and assumed that the promise was made. The rationale of the majority appears to be that the "record discloses no evidence countervailing plaintiff's proofs on the issue; nor did the trial judge make a credibility determination unfavorable to plaintiff." That rationale ignores the fact that the judge made no credibility finding at all and assumes that the fact-finder must accept the testimony of plaintiff and her witnesses simply because nothing was introduced to "countervail or contradict" it. A fact-finder is not required to find testimony credible simply because it is uncontradicted. Ferdinand v. Agric. Ins. Co., 22 N.J. 482, 494, 126 A.2d 323 (1956); In re Perrone's Estate, 5 N.J. 514, 521, 76 A.2d 518 (1950); D'Amato by McPherson v. D'Amato, 305 N.J.Super. 109, 115, 701 A.2d 970 (App.Div.1997); Langley v. Allstate Ins. Co., 206 N.J.Super. 365, 369, 502 A.2d 1162 (App.Div.1985). Moreover, it is well-settled that the testimony of a witness need not be believed where, as here, the only person who could have refuted the evidence is dead. In re Perrone, supra, 5 N.J. at 522, 76 A.2d 518; D'Amato, supra, 305 N.J.Super. at 115, 701 A.2d 970; Gallo v. Gallo, 66 N.J.Super. 1, 5, 168 A.2d 228 (App.Div.1961). Because resolution of the question of whether a promise was made depends upon the credibility of the witnesses, I believe the issue is ill-suited for *211 the exercise of original jurisdiction, particularly in light of the enhanced burden of proof I would impose upon plaintiff, coupled with the fact that Roccamonte, the only person who could contradict the testimony, is dead.
In sum, I would affirm the judgment of the trial court. However, even if it is determined that a promise of the type asserted in this case survives the death of Roccamonte, I would remand for a determination of whether the promise was, in fact, made.
NOTES
[1] We note a discrepancy between the factual recitation on the summary judgment motion and the findings after trial regarding the amounts of the certificate of deposit and the insurance policy. It is of no consequence for our present purposes which was worth $10,000 and which $18,000.
[2] This is an unpublished opinion. "[N]o unpublished opinion shall be cited by any court." R. 1:36-3. "[A]n unpublished opinion does not have stare decisis effect." Pressler, Current N.J. Court Rules, comment on R. 1:36-3 (2001).