ACCEPTED
01-15-00567-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
12/14/2015 12:39:08 PM
CHRISTOPHER PRINE
CLERK

**No. 01-15-00567-CV**

**IN THE COURT OF APPEALS FOR THE FIRST DISTRICT HOUSTON, TEXAS**

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
12/14/2015 12:39:08 PM
CHRISTOPHER A. PRINE
Clerk

**MACKEY GLEN PETERSON, TONYA PETERSON, DON LESLIE PETERSON AND LONNY PETERSON, APPELLANTS**

**v.**

**SILVERADO SENIOR LIVING, INC., D/B/A SILVERADO SENIOR LIVING SUGAR LAND, APPELLEE**

# Appendix Tab 69 - 73

**P. Alan Sanders**
**Tx. State Bar No:  17602100**
**Joshua Davis**
**Tx. State Bar No. 24031993**
**Lewis Brisbois Bisgaard & Smith, LLP**
**Weslayan Tower, Suite 1400**
**24 Greenway Plaza**
**Houston, Texas, 77046**
**(713) 659-6767**
**(713) 759-6830 – Fax**
**Alan.Sanders@LewisBrisbois.com**
**Josh.Davis@LewisBrisbois.com**

TAB 69

FILED
2/6/2015 5:00:15 PM
Stan Stanart
County Clerk
Harris County

Data Entry
Pick Up This Date

PROBATE COURT 1

NO. 427.208 -401

| IN RE: GUARDIANSHIP OF | § | IN THE PROBATE COURT |
|---|---|---|
| | § | |
| RUBY PETERSON | § | NO. ONE |
| | § | |
| AN ALLEGED INCAPACITATED | § | |
| PERSON | § | HARRIS COUNTY, TEXAS |

Transferred from the 129th Judicial District

**CAUSE NO. 2014-40980**

| RUBY PETERSON, MACKEY ("MACK") | § | IN THE DISTRICT COURT |
|---|---|---|
| GLEN PETERSON, DONNIE ("DON") | § | |
| LESLIE PETERSON, Individually and | § | |
| As Attorney in fact for RUBY PETERSON, | § | |
| LONNIE PETERSON | § | |
| | § | |
| PLAINTIFFS | § | |
| | § | |
| VS. | § | HARRIS COUNTY, TEXAS |
| | § | |
| | § | |
| SILVERADO SENIOR LIVING, CAROL | § | |
| ANN MANLEY, DAVID PETERSON, | § | |
| TANA MCMILLAN, DR. REBECCA | § | |
| CLEARMAN, DR. CHRISTOPHER | § | |
| MERKL, AND LINDA LAVINSON, | § | |
| | § | |
| DEFENDANTS | § | 129TH JUDICIAL DISTRICT |

**PLAINTIFFS' & SCHWAGER'S MOTION TO MODIFY ORDERS
CONCERNING RULE 91A DISMISSALS, PLEA TO THE
JURISDICTION AND SANCTIONS**

RUBY PETERSON, INDIVIDUALLY, MACKEY ("MACK") GLEN PETERSON AND DON LESLIE PETERSON, INDIVIDUALLY AND AS NEXT FRIENDS/ ATTORNEY-IN FACT OF RUBY PETERSON, AND LONNY PETERSON, INDIVIDUALLY AND AS NEXT FRIEND OF RUBY PETERSON ("PLAINTIFFS"), AND CANDICE SCHWAGER file this MOTION TO MODIFY ORDERS RELATING

Silverado Appx. 0528

No. 1-15-567-CV **1617**

TO THE DISMISAL OF PLAINTIFFS' CLAIMS AGAINST DEFENDANTS under Rule 91a, Plea to the Jurisdiction, as well as ORDERS issued granting SANCTIONS against CANDICE SCHWAGER. THIS MOTION TO MODIFY is filed by PLAINTIFFS and SCHWAGER (collectively "MOVANTS") based upon new evidence in addition to other grounds. In support thereof, PLAINTIFFS AND SCHWAGER ("MOVANTS") allege as follows:

## I. STATEMENT OF ISSUES

1. PLAINTIFFS, by and through CANDICE SCHWAGER, filed a tort lawsuit in Harris County District Court on or about July 18, 2014, seeking a Temporary Restraining Order and Temporary Injunction against Silverado Senior Living, Carol Ann Manley, David Peterson, et, al. *See Original Petition, verified by 5 sworn affidavits.* PLAINTIFFS non-suited the GUARDIANSHIP APPLICATION filed by MICHAEL HIRSCH immediately.

2. DEFENDANTS amended their pleadings to create jurisdiction to support their request for this Court to transfer PLAINTIFF'S tort case to probate court, which occurred after the July 25, 2014 hearing on DEFENDANTS' MOTION TO TRANSFER. At this hearing, *SARAH PACHECO AND JILL YOUNG represented on the record that they would not hold PLAINTIFFS to representations of MICHAEL HIRSCH—but violated this promise repeatedly thereafter in bad faith and for malicious purposes.*

3. The Court granted the transfer on July 25, 2014 and PLAINTIFFS' APPLICATION FOR TEMPORARY INJUNCTION hearing began on JULY 28, 2014. On July 28, 2014, the Parties had extensive discussions regarding social media posts and videos pertaining to RUBY PETERSON, which had previously been disseminated and revealed that RUBY PETERSON wanted to leave SILVERADO SENIOR LIVING but was held against her will. *See videos of Ruby Peterson, entered into evidence and transcript of JULY 28, 2014 hearing.*

Silverado Appx. 0529

4. DEFENDANTS asked the Judge to enter an ORDER, prohibiting PLAINTIFFS AND/OR THEIR ATTORNEYS from posting the three videos at issue, any other videos, or publicly disseminating information in social media concerning RUBY PETERSON with feigned concerns of RUBY'S privacy rights (and those of others they routinely violate by releases designed to permit SILVERADO to exploit residents in their advertising).

5. The Court refused to do so, acknowledging that this case could be a First Amendment case which generated public concern and further questioning his authority to do so. The Court clearly stated that it would not ORDER SCHWAGER to take the videos down or cease blogging about the case and that the parties had to agree to the "Rule 11 Agreement" or present an appropriate MOTION FOR PROTECTIVE AND/OR GAG ORDER for him to have authority to rule. In deference and out of respect for the Judge, SCHWAGER voluntarily agreed to take the objectionable videos down during the pendency of the TEMPORARY INJUNCTION hearing. The Agreement is reflected on the July 30, 2014 transcript.

6. DEFENDANTS presented no MOTION FOR GAG ORDER despite the Court's invitation to do the same until OCTOBER 9, 2014—the same date the hearing on their sanctions motions occurred. Significantly, JILL YOUNG, RUSS JONES AND DEFENDANTS participated in a four day temporary injunction hearing in which the PLAINTIFFS' claims for false imprisonment, assault and battery, conspiracy, breach of trust, and breach of fiduciary duty were proven with credible evidence, if not as a matter of law. If they believed PLAINTIFFS' ORIGINAL, FIRST OR SECOND AMENDED PETITIONS were frivolous or groundless in violation of Rule 10, 13, or 91a—or that PLAINTIFFS had no standing to assert them, any one of five attorneys could have asserted appropriate MOTIONS TO DISMISS PLAINTIFFS' lawsuit. Notably, none of them filed any such MOTION.

Silverado Appx. 0530

7. DEFENDANTS' counsel, JILL YOUNG AND RUSS JONES all joined together in most pleadings filed by one another regardless of whether SARAH PACHECO AND HER CLIENTS were taking a 180 degree diversion from prior positions or not. The most egregious example is the fact that JILL YOUNG, RUSS JONES, AND THE COURT INVESTIGATOR all concluded prior to MARCH 2014 that the Guardianship Application had no merit and should be dismissed due to less restrictive alternatives, such as a Durable Power of Attorney— but changed their opinions based solely on unambiguous loyalty to SARAH PACHECO. Nothing in this matter changed to justify the about face decision of JILL YOUNG or RUSS JONES' support of DEFENDANTS, except for "who" was the applicant.

8. Bias was repeatedly demonstrated by JONES AND YOUNG prior to SCHWAGER'S lawsuit ever being filed and seemingly immediately upon the Guardianship Application's filing December 10, 2013. Shortly after appointment, both JONES and YOUNG spent less than one hour with PLAINTIFFS and determined that the existence of a power of attorney alone meant that no guardianship should be granted—with both knowing at the time of their objection that NO MEDICAL POWER OF ATTORNEY EXISTED due to Section 166.155 of the Texas Health and Safety Code, the November 15, 2013 revocation executed by RUBY PETERSON (with said revocation never disputed), and the fact that RUBY PETERSON did not execute a MEDICAL POWER OF ATTORNEY after revoking the 1993 POA granted to CAROL ANN MANLEY AND DAVID PETERSON.

9. After unanimously agreeing that A POWER OF ATTORNEY was the least restrictive alternative to RUBY PETERSON and with knowledge that no valid MEDICAL power of attorney existed, JONES, YOUNG AND PACHECO fraudulently concealed this fact to the Court and/or openly deceived the Court when PACHECO stated at the closing day of the Injunction Hearing that her clients had a "DURABLE MEDICAL POWER OF

10. ATTORNEY," knowing this claim to be false. SCHWAGER provided an article written by PACHECO citing Tex. Health and Safety Code 166.155 to demonstrate that DEFENDANTS' had no MEDICAL power of attorney or DURABLE POWER OF ATTORNEY by virtue of the revocation and PACHECO was intentionally defrauding the tribunal in violation of the ethical standards governing attorneys. RUSS JONES later admitted that no MEDICAL POWER OF ATTORNEY existed after November 15, 2013, threatening to recommend guardianship, which was in reality, the only option available at that point to either party.

11. Bias was evident as the hearing began in RUSS JONES' questioning of DR. MERKL, wherein JONES emphasizes how important it is for family members to be present during expert medical evaluations for RUBY'S competency (as CAROL ANN was present with RUBY) to help them accept the diagnosis and not be in denial of her "dementia." See transcript of Chris Merkl's testimony, attached hereto and incorporated herein by reference.

12. Yet, when it came time for MOVANTS' experts to examine RUBY PETERSON, despite the fact that one such expert was a probate regular, DR. MARC KUNIK, RUSS JONES advocated against MOVANTS being even on the premises of SILVERADO SENIOR LIVING— suddenly not moved by PLAINTIFFS' "denial" of her condition, which JONES AND DEFENDANTS repeatedly accused. Why would an impartial appointee who is looking out for RUBY'S best interests be opposed to PLAINTIFFS' having the opportunity to observe and accept their mother's testing and condition, but not DEFENDANTS'.

13. In fact, this was one of the few truthful statements DR MERKL made concerning RUBY PETERSON while testifying. After 9 months of attempting to simply have RUBY seen by one of PLAINTIFFS' EXPERTS / DOCTORS for the sole purpose of determining whether RUBY had dementia by a credible medical professional they could believe, PLAINTIFFS immediately amended their pleadings to reflect the same. Since December of 2013,

Silverado Appx. 0532

14. PLAINTIFFS sought to have their own physician examine RUBY and ease their worries that she was not being inappropriately drugged in ways that might make her appear demented or exacerbate any existing dementia. This belief was not unreasonable given the widespread pandemic of inappropriate psychotropic drugging of the elderly in long term care facilities and PLAINTIFFS' observations of RUBY excessively drugged, particularly given that CAROL ANN MANLEY and DAVID PETERSON admitted RUBY was over-drugged at REMINGTON and stated a preference for SILVERADO because they had creative ways to forcibly drug RUBY if she resisted. *See Transcript of Temporary Injunction Hearing.*

15. Despite the fact that MOVANTS amended the relief sought repeatedly to streamline the expedited trial set for November 17, 2014, MOVANTS appropriately pled that DEFENDANTS violated STATE AND FEDERAL LAW AND CONSTITUTIONAL mandates expressed in the 1st, 5th, 7th, and 14th Amendments, Article I and V, the Anti-Retaliatory provisions of Titles II[2] and III[3] of

---

[1] See, e.g., City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 293, 71 L. Ed. 2d 152, 102 S. Ct. 1070 (1982) (acknowledging that the Texas Constitution could provide broader protections than federal Constitution);Freedman v.New Jersey State Police, 135 N.J. Super. 297,343 A.2d 148, 150 (N.J. Super. Ct. Law Div.1975); William J. Brennan, Jr., The Bill of Rights and the States: The Revival of State Constitutions, as Guardians of Individual Rights, 61 N.Y.U.L.Rev. 535 (1986) (hereinafter Brennan, Revival of State Constitutions); A century-long line of Texas cases support applying our state's constitution, 24 particularly in the area of free speech. Our decision in 1920 to rely on the plain language of article I, section 8 in striking down a prior restraint in Ex Parte Tucker, 220 S.W. at 76 , predated the application of the First Amendment to the states. See Ex Parte Price, 741 S.W.2d 366, 369 (Tex. 1987) (Gonzalez, J., concurring). See also Davenport v. Garcia, 834 S.W.2d 4 (Tex. 1992)( Court records "are presumed to be open to the general public." Tex. R. Civ. P. 76 . The sealing of a record must meet the procedural prerequisites set forth in Rule 76a of the Texas Rules of Civil Procedure . See Chandler v. Hyundai Motor Co., 829 S.W.2d 774 (1992) (per curiam).A court may not escape the strict obligations of those rules by tacitly closing the record through an unwritten order and overruling the gag order upon Guardian Ad Litem for several hundred children involved in the Brio Toxic Waste litigation on the grounds that it violated Article I, Section 8 of the Texas Constitution..

2

Silverado Appx. 0533

the Americans with Disabilities Act of 1990 ("ADA"), implementing regulations under 28 C.F.R. 35.001 et seq, Section 504 of the Rehabilitation Act of 1973 ("Section 504"), the Nursing Home Reform Act of 1987[4], the Elder Justice Act of 2009[5], Title 20 of the Social

---

Title III, which this rule addresses, prohibits discrimination (or retaliation) on the basis of disability in the
activities of places of public accommodation (businesses that are generally open to the public and that fall into one of 12 categories listed in the ADA, such as restaurants, movie theaters, schools, day care facilities, recreation facilities, and doctors' offices) and requires newly constructed or altered places of public accommodation—as well as commercial facilities (privately owned, nonresidential facilities such as factories, warehouses, or office buildings)—to comply with the ADA Standards. 42 U.S.C. 12181–89.

On July 26, 1991, the Department issued rules implementing title II and title III, which are codified at 28 CFR part 35 (title II) and part 36 (title III). Appendix A of the 1991 title III regulation, which is republished as Appendix D to 28 CFR part 36, contains the ADA Standards for Accessible Design (1991 Standards), which were based upon the version of the Americans with Disabilities Act Accessibility Guidelines (1991 ADAAG) published by the Access Board on the same date.

[4] The Nursing Home Reform Act guarantees residents:

The right to freedom from abuse, mistreatment, and neglect;
The right to freedom from physical restraints;
The right to privacy;
The right to accommodation of medical, physical, psychological, and social needs;
The right to participate in resident and family groups;
The right to be treated with dignity;
The right to exercise self-determination;
The right to communicate freely;
The right to participate in the review of one's care plan, and to be fully informed in advance about any changes in care, treatment, or change of status in the facility; and
The right to voice grievances without discrimination or reprisal.
If the nursing home or long term care facility is determined to be out of compliance as Silverado is in this matter, the following penalties are imposed:
Civil monetary penalties;
Denial of payment for all new Medicare or Medicaid admissions; Denial of payment for3 all Medicaid or Medicare patients;

[5] The Elder Justice Act was signed into law by President Obama on March 23, 2010, as part of the Patient Protection and Affordable Care Act. It provides federal resources to "prevent, detect, treat, understand, intervene in and, where appropriate, prosecute elder abuse, neglect and

Silverado Appx. 0534

Security Act,[6] the Elder Bill of Rights of Texas Human Resources Code Section 102.003[7],

exploitation." Sec. 2012. [42 U.S.C. 1397j-1] (a) Protection of Privacy.—In pursuing activities under this subtitle, the Secretary shall ensure the protection of individual health privacy consistent with the regulations promulgated under section 264(c) of the Health Insurance Portability and Accountability Act of 1996[12] and applicable State and local privacy regulations

(b) Rule of Construction.—Nothing in this subtitle shall be construed to interfere with or abridge an elder's right to practice his or her religion through reliance on prayer alone for healing when this choice—

(1) is contemporaneously expressed, either orally or in writing, with respect to a specific illness or injury which the elder has at the time of the decision by an elder who is competent at the time of the decision;

(2) is previously set forth in a living will, health care proxy, or other advance directive document that is validly executed and applied under State law; or

(3) may be unambiguously deduced from the elder's life history.

[12] See Vol. II, P.L. 104–191, §264(c).

[6] These Statues impose revocation of Medicare and Medicaid participant status for violating the rights of the elderly with chemical restraints as Silverado Senior Living has done and place them at risk of losing all federal money for their billion dollar hospice business, for which Medicare pays 100% of the cost. *See when social media means noncompliance, attached hereto and incorporated by reference.*

[7] Sec. 102.003. RIGHTS OF THE ELDERLY. (a) An elderly individual has all the rights, benefits, responsibilities, and privileges granted by the constitution and laws of this state and the United States, except where lawfully restricted. The elderly individual has the right to be free of interference, coercion, discrimination, and reprisal in exercising these civil rights.

(b) An elderly individual has the right to be treated with dignity and respect for the personal integrity of the individual, without regard to race, religion, national origin, sex, age, disability, marital status, or source of payment. This means that the elderly individual:

(1) has the right to make the individual's own choices regarding the individual's personal affairs, care, benefits, and services;

(2) has the right to be free from abuse, neglect, and exploitation; and

(3) if protective measures are required, has the right to designate a guardian or representative to ensure the right to quality stewardship of the individual's affairs.

(c) An elderly individual has the right to be free from physical and mental abuse, including corporal punishment or physical or chemical restraints that are administered for the purpose of discipline or convenience and not required to treat the individual's medical symptoms. A person providing services may use physical or chemical restraints only if the use is authorized in writing by a physician or the use is necessary in an emergency to protect the elderly individual or others from injury. A physician's written authorization for the use of restraints must specify

**Silverado Appx. 0535**

the circumstances under which the restraints may be used and the duration for which the restraints may be used. Except in an emergency, restraints may only be administered by qualified medical personnel.

(d) A mentally retarded elderly individual with a court-appointed guardian of the person may participate in a behavior modification program involving use of restraints or adverse stimuli only with the informed consent of the guardian.

(e) An elderly individual may not be prohibited from communicating in the individual's native language with other individuals or employees for the purpose of acquiring or providing any type of treatment, care, or services.

(f) An elderly individual may complain about the individual's care or treatment. The complaint may be made anonymously or communicated by a person designated by the elderly individual. The person providing service shall promptly respond to resolve the complaint. The person providing services may not discriminate or take other punitive action against an elderly individual who makes a complaint.

(g) An elderly individual is entitled to privacy while attending to personal needs and a private place for receiving visitors or associating with other individuals unless providing privacy would infringe on the rights of other individuals. This right applies to medical treatment, written communications, telephone conversations, meeting with family, and access to resident councils. An elderly person may send and receive unopened mail, and the person providing services shall ensure that the individual's mail is sent and delivered promptly. If an elderly individual is married and the spouse is receiving similar services, the couple may share a room.

(h) An elderly individual may participate in activities of social, religious, or community groups unless the participation interferes with the rights of other persons.

(i) An elderly individual may manage the individual's personal financial affairs. The elderly individual may authorize in writing another person to manage the individual's money. The elderly individual may choose the manner in which the individual's money is managed, including a money management program, a representative payee program, a financial power of attorney, a trust, or a similar method, and the individual may choose the least restrictive of these methods. A person designated to manage an elderly individual's money shall do so in accordance with each applicable program policy, law, or rule. On request of the elderly individual or the individual's representative, the person designated to manage the elderly individual's money shall make available the related financial records and provide an accounting of the money. An elderly individual's designation of another person to manage the individual's money does not affect the individual's ability to exercise another right described by this chapter. If an elderly individual is unable to designate another person to manage the individual's affairs and a guardian is designated by a court, the guardian shall manage the individual's money in accordance with the Probate Code and other applicable laws.

(l) An elderly individual may choose and retain a personal physician and is entitled to be fully informed in advance about treatment or care that may affect the individual's well-being.

(m) An elderly individual may participate in an individual plan of care that describes

Silverado Appx. 0536

the individual's medical, nursing, and psychological needs and how the needs will be met.

(n) An elderly individual may refuse medical treatment after the elderly individual: (1) is advised by the person providing services of the possible consequences of refusing treatment; and

(2) acknowledges that the individual clearly understands the consequences of refusing treatment.

(s) Except in an emergency, a person providing services may not transfer or discharge an elderly individual from a residential facility until the 30th day after the date the person providing services provides written notice to the elderly individual, the individual's legal representative, or a member of the individual's family stating:

(1) that the person providing services intends to transfer or to discharge the elderly individual;

(2) the reason for the transfer or discharge listed in Subsection (r);

(3) the effective date of the transfer or discharge;

(4) if the individual is to be transferred, the location to which the individual will be transferred; and

(5) the individual's right to appeal the action and the person to whom the appeal should be directed.

(t) An elderly individual may:

(1) make a living will by executing a directive under the Natural Death Act (Chapter 672, Health and Safety Code);

(2) execute a durable power of attorney for health care under Chapter 135, Civil Practice and Remedies Code; or

(3) designate a guardian in advance of need to make decisions regarding the individual's health care should the individual become incapacitated.

Added by Acts 1983, 68th Leg., p. 5159, ch. 936, Sec. 1, eff. Sept. 1, 1983. Amended by Acts 1997, 75th Leg., ch. 475, Sec. 1, eff. Sept. 1, 1997.

[8] (a) The resident has the right to exercise his rights as a resident at the facility and as a citizen or resident of the United States.

(b) The resident has the right to be free of interference, coercion, discrimination, or reprisal from the facility in exercising his rights.

(c) In the case of a resident adjudged incompetent under the laws of the State of Texas by a court of competent jurisdiction, the rights of the resident are exercised by the person appointed under Texas law to act on the resident's behalf.

(d) The facility must comply with all applicable provisions of the Human Resources Code, Title 6, Chapter 102. An individual may not be denied appropriate care on the basis of his race, religion, color, national origin, sex, age, handicap, marital status, or source of payment.

(e) The facility must allow the resident the right to observe his religious beliefs. The facility must respect the religious beliefs of the resident in accordance with 42 United States Code §1396f.

[9] (a) A resident has the right to:

(1) voice grievances without discrimination or reprisal. These grievances include those with respect to treatment which has been furnished as well as that which has not been furnished;

(2) prompt efforts by the facility to resolve grievances the resident may have, including those with respect to the behavior of other residents; and

(3) notify state agencies of complaints against a facility. Complaints will be acknowledged by the staff of the agency that receives the complaint. All complaints will be investigated, whether oral or written.

(b) A nursing facility may not retaliate or discriminate against a resident, a family member or guardian of the resident, or a volunteer because the resident, the resident's family member or guardian, a volunteer, or any other person:

(1) makes a complaint or files a grievance concerning the facility;

(2) reports a violation of law, including a violation of laws or regulations regarding nursing facilities; or

(3) initiates or cooperates in an investigation or proceeding of a governmental entity relating to care, services, or conditions at the nursing facility.

(c) A facility may not discharge or otherwise retaliate against:

(1) an employee, resident, or other person because the employee, resident, or other person files a complaint, presents a grievance, or otherwise provides in good faith information relating to the misuse of a restraint or involuntary seclusion at the facility; or

(2) a resident because someone on behalf of the resident files a complaint, presents a grievance, or otherwise provides in good faith information relating to the misuse of a restraint or involuntary seclusion at the facility.

[10] (a) A resident has the right to have access to, and the facility must provide immediate access to a resident to, the following:

(7) subject to the resident's right to deny or withdraw consent at any time, immediate family or other relatives of the resident; and

(8) subject to reasonable restrictions and the resident's right to deny or withdraw consent at any time, others who are visiting with the consent of the resident.

(b) A facility must provide reasonable access to a resident by any entity or individual that provides health, social, legal, or other services to the resident, subject to the resident's right to deny or withdraw consent at any time.

[11] (a) The resident has the right to have reasonable access to the use of a telephone (other than a pay phone), where calls can be made without being overheard, and which can also be used for making calls to summon help in case of emergency.

(b) The facility must permit residents to contract for private telephones at their own expense. The facility must not require private telephones to be connected to a central switchboard.

Silverado Appx. 0538

et seq.,[12] 38 C.F.R. 52.70,[13] Mandatory Duty to Report Elder Abuse, Neglect, or

---

[12] § 483.10 Resident rights.

The resident has a right to a dignified existence, self-determination, and communication with and access to persons and services inside and outside the facility. A facility must protect and promote the rights of each resident, including each of the following rights:

(a) Exercise of rights.

(1) The resident has the right to exercise his or her rights as a resident of the facility and as a citizen or resident of the United States.

(2) The resident has the right to be free of interference, coercion, discrimination, and reprisal from the facility in exercising his or her rights.

(d) Free choice. The resident has the right to—

(1) Choose a personal attending physician;

(2) Be fully informed in advance about care and treatment and of any changes in that care or treatment that may affect the resident's well-being; and

(3) Unless adjudged incompetent or otherwise found to be incapacitated under the laws of the State, participate in planning care and treatment or changes in care and treatment.

(e) Privacy and confidentiality. The resident has the right to personal privacy and confidentiality of his or her personal and clinical records.

(1) Personal privacy includes accommodations, medical treatment, written and telephone communications, personal care, visits, and meetings of family and resident groups, but this does not require the facility to provide a private room for each resident;

(i) Mail. The resident has the right to privacy in written communications, including the right to—

(1) Send and promptly receive mail that is unopened; and

(2) Have access to stationery, postage, and writing implements at the resident's own expense.

(j) Access and visitation rights.

(1) The resident has the right and the facility must provide immediate access to any resident by the following:

(i) Any representative of the Secretary;

(ii) Any representative of the State:

(iii) The resident's individual physician;

(iv) The State long term care ombudsman (established under section 307(a)(12) of the Older Americans Act of 1965);

(v) The agency responsible for the protection and advocacy system for developmentally disabled individuals (established under part C of the Developmental Disabilities Assistance and Bill of Rights Act);

(vi) The agency responsible for the protection and advocacy system for mentally ill individuals (established under the Protection and Advocacy for Mentally Ill Individuals Act);

Silverado Appx. 0539

Exploitation under Federal Law (felony), 18 U.S.C. 371 and Texas Penal Code Section 22.04[14] (non-delegable duty for licensed attorneys to report any suspicion of abuse, neglect

(vii) Subject to the resident's right to deny or withdraw consent at any time, immediate family or other relatives of the resident; and

(viii) Subject to reasonable restrictions and the resident's right to deny or withdraw consent at any time, others who are visiting with the consent of the resident.

(2) The facility must provide reasonable access to any resident by any entity or individual that provides health, social, legal, or other services to the resident, subject to the resident's right to deny or withdraw consent at any time.

(3) The facility must allow representatives of the State Ombudsman, described in paragraph (j)(1)(iv) of this section, to examine a resident's clinical records with the permission of the resident or the resident's legal representative, and consistent with State law.

(k) Telephone. The resident has the right to have reasonable access to the use of a telephone where calls can be made without being overheard.

(l) Personal property. The resident has the right to retain and use personal possessions, including some furnishings, and appropriate clothing, as space permits, unless to do so would infringe upon the rights or health and safety of other residents.

(m) Married couples. The resident has the right to share a room with his or her spouse when married residents live in the same facility and both spouses consent to the arrangement.

(n) Self-Administration of Drugs. An individual resident may self-administer drugs if the interdisciplinary team, as defined by § 483.20(d)(2)(ii), has determined that this practice is safe.

[13] 38 C.F.R. 52.70 Participant rights for which Medicare eligibility to Long Term Care facility may be revoked

The participant has a right to a dignified existence, self-determination, and communication with and access to persons and services inside and outside the facility. The program management must protect and promote the rights of each participant, including each of the following rights:

(a) *Exercise of rights.* (1) The participant has the right to exercise his or her rights as a participant of the program and as a citizen or resident of the United States.

(2) The participant has the right to be free of interference, coercion, discrimination, and reprisal from the program management in exercising his or her rights.

(3) The participant has the right to freedom from chemical or physical restraint.

[14] § 22.04.

> (a)     A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child, elderly individual, or disabled individual:
>
> (1  serious bodily binjury;
>
> **(2)** Serious mental deficiency, impairment, or injury;     or

**Silverado Appx. 0540**

or exploitation, Class B misdemeanor),[15] 18 U.S.C. 241 (intentional deprivation of Constitutional rights, federal felony), 18 U.S.C. 242 (conspiracy to violate Constitutional rights, felony), 18 U.S.C 247 (Deprivation of the right of free exercise of religion intentionally, felony), 42 U.S.C. 1983, the Texas Citizens Participation Act (Anti-SLAPP Statute)[16], Texas Rules of Civil Procedure 10 and 13, and Texas Disciplinary Rules of Professional Conduct 1.15, 3.01, 3.02, 3.04, 3.05, 4.01, 4.04, 5.08 and 8.04.

16. DEFENDANTS' ultimately attacked PLAINTIFFS' claims for ASSAULT AND BATTERY, FALSE IMPRISONMENT, AND CONSPIRACY, stating that there was no legal basis for them to recover due to lack of standing and/or no factual evidence to support the claims. Both of the foregoing claims are WRONG and should never have been DISMISSED under Rule 91a or pursuant to plea in abatement filed by JILL YOUNG AND RUSS JONES.

17. The Rule 11 Agreement executed October 18, 2014 did not deprive PLAINTIFFS of standing because it was void when executed by illegality, duress, lack of consideration, and fraudulent inducement. As previously briefed and argued to this Court, Chapter 166 of the Texas Health and Safety Code clearly states that only a principal can revoke a MEDICAL POWER OF ATTORNEY and whether competent or incompetent, the revocation is effective immediately, requiring that SILVERADO, JILL YOUNG, RUSS JONES, JOSH DAVIS, SARAH PACHECO, CAROL ANN MANLEY, AND DAVID PETERSON acknowledge that fact to this Court, with SILVERADO having the additional duty to observe it and comply.

18. Despite these attorneys and their clients' knowledge that the 1993 MEDICAL POWER OF ATTORNEY was revoked November 15, 2013 and that the revocation was EFFECTIVE whether she was incapacitated or not (with a presumption under the

Silverado Appx. 0541

Probate / Estates Code of capacity), Court Investigator Andi Pavlicek's Report (a mere four days after the

19. guardianship application was served on Defendant's with no doctor's input or information about the estate) states that SILVERADO SENIOR LIVING does not acknowledge the November power of attorney because (they believed) RUBY lacked capacity. Unfortunately for SILVERADO, they do not have the luxury of deciding that question because Texas Health and Safety Code 166.155 has decided the issue for them.

20. First and foremost, the DEFENDANTS all knew that a power of attorney could not legally confine RUBY PETERSON against her will and admit that she was being held against her will. The medical records provided by RUSS JONES from Silverado Senior Living are replete with instances of RUBY PETERSON crying and screaming to go home. DR. MERKL testified that she cried and asked for a minister in addition to stating she wanted to go home. DEFENDANTS never took issue with the fact that RUBY wanted out of SILVERADO SENIOR LIVING. Instead, RUSS JONES tried to twist what RUBY meant when she said home. But home wasn't the only place RUBY wanted to go. She repeatedly told SILVERADO AND DEFENDANTS that she wanted to go to church and wanted to spend time with her sons outside of SILVERADO'S walls. Each time she asked, testimony confirms that CAROL ANN and SILVERADO acted together to deny her this right.

21. SILVERADO carried out CAROL ANN'S INSTRUCTIONS to deny PLAINTIFFS the right to even see their mother for six weeks between November 15, 2013 and Christmas of that year—only allowing visitation to resume if they agreed to sign an onerous Rule 11 Agreement on the eve of Christmas under emotional duress.

22. This Court, at DEFENDANTS' false promptings, states that actions of SCHWAGER prevented the family from settling this matter which could easily have been done when

JUDGE SYLVIA MATTHEWS on July 19, 2014 to which she replied "absolutely not."

23. PACHECO refused to mediate because DEFENDANTS had all of the leverage against PLAINTIFFS and no incentive to do so. Were this not so, the matter would have been resolved amicably in December of 2013, not a year later after a Motion to Compel had to be filed to even have a doctor of PLAINTIFFS' choosing examine RUBY and determine whether she was safe and being cared for appropriately. PACHECO complains that PLAINTIFFS' accusations of nefarious conduct towards RUBY by DEFENDANTS is outrageous KNOWING that her clients stonewalled PLAINTIFFS, refused to provide them with any information about RUBY'S wellbeing, secretly incarcerated RUBY at SILVERADO without prior notice to anyone or agreement, never mentioned the trust and/or power of attorney PLAINTIFFS discovered in 2013, and of the countless lies and aggressive attempts to deliberately hide information and/or assets of RUBY'S.

24. If DEFENDANTS' actions were appropriate, there was never any cause for DEFENDANTS' aggressive actions and this matter would never have escalated to the first lawsuit (guardianship) much less a second (District Court action) or a third (federal Court action). At all times, PLAINTIFFS and their attorneys have acted out of concern for RUBY PETERSON. PLAINTIFFS had good cause to believe that DEFENDANTS were inappropriately drugging their mother, of which some medical evidence was obtained through Dr. Tennison and Ruby's medical records—prior to settlement. DEFENDANTS admitted drugging RUBY against her will, which is an assault under the law. DEFENDANTS admitted holding RUBY against her will and the medical records entered into evidence speak for themselves, stating that RUBY would be found crying and screaming to go home.

Silverado Appx. 0543

25. FIVE AFFIDAVITS were submitted with each amended petition, pared down in an effort to simply the trial in this case with the expertise of a seasoned civil rights attorney editing the exhaustive work of SCHWAGER, who pled claims for which evidence was presented During the four day injunction hearing. *See testimony of David Peterson, Carol Ann Peterson, Dr. Merkl, Carol Jane Peterson, Don Peterson, Lonnie Peterson, Tonya Peterson, Mack Peterson, Tana McMillan and Dr. John Tennison.* The additional DEFENDANTS sued, DR. MERKL, DR. CLEARMAN, TANA MCMILLAN AND LINDA LAVINSON demonstrated culpability for some of torts alleged in this lawsuit and were only dismissed to streamline the litigation between the parties. At no time did Plaintiffs represent or concede (and DEFENDANTS certainly never proved) that claims against these DEFENDANTS lacked evidentiary support or were asserted for any other purpose than believed absolutely legitimate and supported by evidence at the time the pleading was filed. Furthermore, none of these parties were ever even served, so they did not have to incur any expense retaining an attorney to represent them. There was no harm to them and PLAINTIFFS (and counsel) cannot be sanctioned for a libel claims they are barred from pursuing by the litigation privilege. Rule 10 and 13 do not impose sanctions for anything less than bad faith and/or intent to harass, which has never been proven by DEFENDANTS.

26. The Sanctions ORDERS issued November 10, 2014 and addressed December 9, 2014 in hearing, which were affirmed by this Court on January 9, 2015—are simply not supported by credible evidence and must be rescinded, modifying the ORDERS. First and foremost, the Court cannot use an illegal rule 11 agreement which only (albeit illegally) says the Parties agree that CAROL ANN AND DAVID can continue to use the 1993 POWER OF ATTORNEY –rather than saying they admit that their NOVEMBER 2013 DURABLE POWER OF ATTORNEY AND REVOCATION were invalid. As

Silverado Appx. 0544

have no merit because NOW THEY MIGHT lack standing, which PLAINTIFFS deny

because the Rule 11 is void and always was void. DEFENDANTS obtained dismissal of PLAINTIFFS' claims against them by fraud and a shot gun approach of misrepresentations and lies designed to confuse the issues and mislead the Court, while inflaming the Judge's passions against PLAINTIFFS and their attorney in ways that egregiously violate a litany of disciplinary rules.

27. The Court never found SCHWAGER violated the Protective Order and in fact, the blogging of which DEFENDANTS complain occurred over a 10 month period prior to the lawsuit and during periods of time in which no protective order or rule 11 agreement was in place to give SCHWAGER notice that her FIRST AMENDMENT PROTECTED SPEECH could ever serve as a basis for sanctions by this Court. First and foremost, the Judge represented that he would not interfere with the right to blog and speak publicly about the case under the First Amendment during hearings that occurred July 28 and 30, 2014. See Transcript.

28. Second, SARAH PACHECO complains of media attention yet she willingly ran to interview with KPRC Channel Two News when they appeared in Court on or about July 30, 2014—and gave a statement on camera to be televised. This was prior to most all of the blogs she objected to and flies in the face of her alleged distaste for publicity concerning this case. Notably, SCHWAGER declined comment to the reporter, deferring to her client and PHIL ROSS to choose to comment or refrain. This proves who sought the spotlight to promote herself—PACHECO. JONES, YOUNG AND PACHECO were angry with SCHWAGER for pointing out lies and the failure to perform their duties required by State and Federal Law, much like JOSH DAVIS and SILVERADO SENIOR LIVING, whose anger stemmed from being exposed for

wrongdoing and little else.

29.     The MOTIONS FOR SANCTIONS and to DISMISS PLAINTIFFS' CLAIMS whether under RULE 91A OR PLEA IN ABATEMENT / JURISDICTION, were frivolous and sanctionable under Rule 10 and 13. PLAINTIFFS again pray for sanctions. PLAINTIFFS FILED FOR TEMPORARY INJUNCTION and pled with the Court to grant relief, fearing their mother would die at Silverado. The Court dismissed PLAINTIFFS' claims against SILVERADO on Thursday, December 6, 2014. RUBY DIED on the 11th of December, 2013 to PLAINTIFFS' horror. DEFENDANTS breached their purported Rule 11 Agreement by failing to ever remove her from SILVERADO and demonstrated bad faith in the obvious intent to never comply with their obligation to do so. RUBY PETERSON died at SILVERADO SENIOR LIVING, after exclaiming how she was "an old woman with no rights."

30.     DAVIS, PACHECO, JONES AND YOUNG demanded sanctions to this Court based upon inadmissible hearsay, slanderous accusations of SCHWAGER they knew to be false or lacked any evidence to state when stated, and pleadings filed in the federal case which were not authored by SCHWAGER and which they knew to be the case. SCHWAGER had the right to blog and is protected by the First Amendment of the United States Constitution as well as Article I, Section 8 of the Texas Constitution, resulting in an outrageous award of attorneys' fees to SILVERADO SENIOR LIVING for abusing and contributing to the wrongful death of RUBY PETERSON. PLAINTIFFS pled for an injunction to save their mother's life. She died just as they feared. They proved their claims. There's nothing frivolous about this lawsuit.

31.     The Sanctions transcript is attached hereto and incorporated herein, highlighting the intentional efforts of DEFENDANTS' COUNSEL, SARAH PACHECO, JILL YOUNG, JOSH DAVIS AND RUSS JONES to inflame and prejudice the judge against SCHWAGER by bringing

during a sanctions hearing.

32.     The entire hearing was replete with unauthenticated hearsay and hearsay within hearsay properly objected to but permitted over objection. This violates SCHWAGER'S right to due process by not providing her with the opportunity to be heard, after she proved with medical documentation and affidavit that her absence at said hearing was medically mandated due to high blood pressure and tachycardia.

33.     Clearly, the Judge was angry by the statements issued and that anger appears to have motivated high sanctions which fail to describe the conduct specifically engaged in by SCHWAGER for which the Judge claims Rule 3.7 was violated (acknowledging in the 7.28.14 hearing this rule is usually in high profile and criminal trials) for actions not covered by any protective order, Rule 11 Agreement or gag order and under circumstances which indicate SCHWAGER understood the Judge gave her a green light to blog whatever she pleased. See transcript attached.

34.     JOSH DAVIS, SARAH PACHECO AND RUSS JONES will deny the same, but the timing of their late filed BRIEFS to deny PLAINTIFFS' APPLICATION FOR TEMPORARY INJUNCTION and nearly identical MOTIONS FOR SANCTIONS filed in unison blatantly suggest a concerted effort to illegally retaliate. MOVANTS have been aligned against RESPONDENTS from the outset of this litigation without any attempts to communicate with PLAINTIFFS' counsel, such that one PARTY effectively speaks for all. REPONDENTS urge the Court to consider the joint vexatious efforts of DEFENDANTS' and their counsel to harass, intimidate, and retaliate for exposing wrongdoing on their part. Nevertheless, RESPONDENTS will address each frivolous argument asserted in their conspiracy of retaliatory MOTIONS.

Silverado Appx. 0547

**Rule 1.15: Declining or Terminating Representation**

**a. A lawyer shall decline to represent a client or, where representation has commenced, shall withdraw, except as stated in paragraph ( c) from representation if:**

> **i. The representation will result in a violation of Rule 3.08, other applicable professional conduct or other law**

35. DEFENDANTS, CAROL ANN MANLEY AND DAVID TROY PETERSON, AS WELL AS SILVERADO SENIOR LIVING and its employees are violating a long list of federal and state statutes, which guarantee RUBY PETERSON, enumerated rights listed herein. Their misconduct in filing knowingly frivolous pleadings designed to harass and increase the costs of litigation, while wasting judicial resources on petty complaints that have no place in this proceeding, as well as attempts to demean and degrade witness with patently irrelevant, knowingly admissible evidence—should not be tolerated.

36. Nor should the Court tolerate DAVIS AND PACHECO'S attempt to elicit bias from this Honorable Judge by PACHECO'S highly unethical and improper questioning of PLAINTIFFS' expert witness, DR. JOHN TENNISON, M.D., a highly qualified forensic psychiatrist who is a member of the American Medical Association, unlike DR. CHRISTOPHER MERKL, who violates patient's rights in forcibly drugging RUBY PETERSON or deceiving her to take drugs that she has unambiguously objected to. To the Contrary, SCHWAGER complimented the Judge in a disability rights venue of 71,000 members, stating that he was by far the most

impressive Judge she had practiced before in 16 years.

Silverado Appx. 0549

37. In response to SCHWAGER merely defending her record in stating that no JUDGE ever sanctioned her for social media or anything other than a nominal mistake in a pleading of the amount the defendant stole from his incapacitated mother, the Court insisted that it was not looking to extraneous things in determining sanctions, yet the entire sanctions hearing was one extraneous exhibit after another and a federal petition which was never even filed, but certainly not filed by SCHWAGER.

38. PACHECO AND DAVIS have violated 4.01 and 4.04 by their complicity in inappropriate criminal threats against PLAINTIFFS and their attorney for criminal trespass and contempt solely to gain an advantage in a civil proceeding. PACHECO demonstrates no respect for the rights of third persons or integrity of these proceedings with highly inflammatory, slanderous questions targeted to place witnesses in a false light to the Court. This was degrading and a violation of the Rules governing attorneys' behavior. Rule 3.04,4.04. Her actions justify sanctions for abusing process to harass, intimidate and retaliate illegally against PLAINTIFFS and their ATTORNEY.

39. In Flynt v. Falwell, The Court noted that the First Amendment vigorously protects the right to criticize in matters of core public and political concern. With elder abuse and exploitation a nationwide epidemic the issues asserted in this matter could not be greater "core political speech" on matters of public concern. *See articles published by the American Bar Association, Senior Housing News, Long Term Living Magazine, Southeast Texas Register, Texas Bar Feature*

Silverado Appx. 0550

40.     DAVIS has intentionally and relentlessly deceived this Court with adamant statements of SILVERADO SENIOR LIVING'S deep concern for the privacy rights of its residents, RUBY PETERSON, and employees when the truth of the matter is that SILVERADO's objections to the video and evidence in this case being public are strictly financial.

41.     JOSH DAVIS has further attempted to deceive the Court by placing SCHWAGER in a false light, as if he just happened to stumble upon SCHWAGER'S social media posts and the videos at issue. The attached exhibits regarding SILVERADO'S marketing reveal that 80-90% of their target market, baby boomers, are on Facebook. The foregoing violations of the Disciplinary Rules are certainly not comprehensive but demonstrate that both attorneys have a duty to withdraw under Rule 1.15 and have not.

**b. Rule 3.01 Meritorious Claims and Contentions**

        **a. A lawyer shall not bring or defend a proceeding, or assert or controvert any issue therein, unless the lawyer reasonably believes that there is a basis for doing so that is not frivolous.**[15]

42. DAVIS violated Rule 3.01 in sending the first cease and desist letter and accompanying emails to SCHWAGER, threatening a TEMPORARY RESTRAINING ORDER that has not been granted in the State of Texas in 200 years or upheld in the United States Supreme Court. This necessarily means that DAVIS threatens criminal and disciplinary action in this proceeding SOLELY to gain an advantage, violating Rule 4.04.

43. The disingenuous assertion that SILVERADO'S concern is the privacy rights

Silverado Appx. 0551

of RUBY PETERSON while violating her privacy rights with respect to meeting with her family, use of telephones, the assaultive shower incident, and mail reveals that SILVERADO has no respect for RUBY'S privacy rights. The attached exhibits revealing SILVERADO'S routine exploitation of their residents by using them in advertising—when they have no personal ability to consent. SILVERADO also routinely uses employees in Youtube videos, with TANNA MCMILLAN testifying that upon entering the facility, employees and residents sign documents waiving privacy rights so that SILVERADO can use them in their advertising.

44.     Likewise, PACHECO is complicit in her client's dishonesty as demonstrated in DAVID PETERSON'S own testimony during the injunction hearing. PETERSON essentially testified that even perjury was acceptable if the ends justified the means, stating, "If you gotta lie, you gotta lie, Bill Clinton did it." Significantly, Bill Clinton perjured himself for whom impeachment proceedings were instituted, leaving the implication that for DAVID PETERSON, perjury is within the realm of acceptable actions. Moreover, DAVID PETERSON AND CAROL ANN MANLEY unambiguously testified to facts that demonstrate breach of fiduciary duty to RUBY PETERSON and PLAINTIFFS regarding the PETERSON FAMILY TRUST and RUBY'S estate, yet PACHECO'S response is to try to drive up the legal costs astronomically upon PLAINTIFFS, who are the victims of her client's breaches of fiduciary duty to reach an inequitable result. This violates Rule 3.01, as well as Rule 3.02 (minimizing burdens of litigation)

45.     RUSS JONES files a knowingly frivolous request for sanctions on the basis on representations of PLAINTIFFS' perceptions as to whether RUBY PETERSON suffered from dementia or was being excessively drugged by SILVERADO SENIOR LIVING. Given that PLAINTIFFS are not medical professionals and were refused the opportunity

to conduct a medical assessment with their own experts, it is perfectly reasonable for PLAINTIFFS to have pled their perceptions at the time and amend pleadings when credible expert testimony convinced them otherwise.

      **i. Comment: The advocate has a duty to use legal procedure for the fullest benefit of the client's cause, but also a duty to not abuse legal procedure.**

46. This entire hearing and the three retaliatory frivolous MOTIONS FOR SANCTIONS constitute an abuse of process in violation of Rule 3.01. JONES, PACHECO AND DAVIS' motions are necessarily frivolous and intended to harass the PLAINTIFFS and SCHWAGER. The Court should take notice that PLAINTIFFS and their ATTORNEYS are not the parties filing frivolous pleadings or harassing witnesses in violation of the Disciplinary Rules—MOVANTS are.

      **ii. All judicial systems prohibit, at a minimum, the filing of frivolous or knowingly false pleadings, motions, or other papers with the Court or the assertion in an adjudicatory proceeding of a knowingly false claim or defense. A filing or assertion is frivolous if it is made primarily for the purpose of harassing or maliciously injuring a person. It is also frivolous if the lawyer cannot make a good faith argument that the action taken is consistent with existing law...**

SANCTIONS MOTIONS, intended to harass and maliciously injure PLAINTIFFS, JOHN TENNISON, M.D., and CANDICE SCHWAGER for acting within their lawful rights, MOVANTS should not be rewarded for "unclean hands" and the litany of

disciplinary and ethics rules they have violated, notwithstanding the egregious abuse of process. PACHECO abuses process maliciously by intentionally defaming and degrading PLAINTIFFS, their expert and counsel with defamatory and/or irrelevant, inadmissible statements designed to elicit the passions of the Judge—simply because she knows she can GET AWAY WITH IT in civil litigation does not mean this right should be abused in this manner. Yet, PACHECO has no problem attacking and degrading PLAINTIFFS, their expert and counsel simply because she could. She intentionally deceived the tribunal stating that SCHWAGER had been sanctioned in other "COURTS" when this is not at all true and objectively verifiable. PACHECO had no evidence upon which to base this lie, but said it anyway.

### iii. A Lawyer should conform not only to this Rules prohibition of frivolous filings or assertions but also to any more stringent applicable rule of practice or procedure.

49. This Rule implicates Texas Rules of Civil Procedure 10 and 13, which all three movants have violated in' their assertion of patently frivolous MOTIONS FOR SANCTIONS AND/OR CONTEMPT. Tex. R. Civ. P. 10, 13. The Lawyer's Creed is also balanced by the duty to report dishonesty, fraud, elder abuse, neglect and exploitation. A lawyer does not violate the Lawyer's creed or Rule 4.01 or 3.07 by publicly revealing evidence

Silverado Appx. 0554

introduced in the record or the substance of allegations confidently pled in live pleadings. Nor does a lawyer violate any ethical duty by expressing an opinion as to dishonest acts of licensed attorneys, violating sworn obligation to uphold the Constitution and laws of this State. Furthermore, the preamble of the Disciplinary Rules is aspirational and counter-balanced by serious concerns of wrongdoing in this case. MOVANTS' torts and crimes against RUBY potentially subject DEFENDANTS and their counsel to criminal and/or disciplinary actions as accessories or conspirators in their complicity with federal and state felonies.

### c. Rule 3.02 Minimizing the Burdens of Litigation

a. **In the course of litigation, a lawyer shall not take a position that unreasonably increases the costs or other burdens of the case...**

b. **...One example of such impermissible conduct is a lawyer who counsels or assists a client in seeking a multiplication of the costs or other burdens of litigation as the primary purpose, because the client perceives himself as more readily able to bear those burdens than its opponent, and so hopes to gain an advantage in resolving the matter unrelated to the merits...**

50. DAVIS, PACHECO AND JONES violate Rule 3.02 by multiplying the costs of litigation and seeking for the victims to put up security while they "milk" their mother's estate and/or the family trust to pay their lawyer's fees. PLAINTIFFS requested an accounting from PACHECO in January and graciously provided an

Silverado Appx. 0555

yet to produce anything remotely resembling an accounting—having little doubt of her client's duty to do so under the Texas Property Code and Trust Code. Outrageously, she attempted to charge -$30,000 to $50,000 to PLAINTIFFS simply to be given the accounting to which they are entitled by law and DEFENDANTS are statutorily required to keep.

51. PACHECO tried to burden PLAINTIFFS with astronomical costs to achieve results she would fail to obtain if she pursued the actual libel claim asserted herein.

52. JOSH DAVIS violates Rule 3.02 by his overly broad, unduly burdensome harassing subpoena duces tecum, designed to burden PLAINTIFFS with exorbitant costs to depose experts, with Dr. Tennison so thoroughly examined during the Injunction hearing, it is difficult to imagine he could have anything more substantial to say than has already been testified in open court.

**Rule 3.03 Candor toward the tribunal**

a. **A lawyer shall not knowingly:**

i. **Make a false statement of material fact or law to a tribunal**

ii. **Fail to disclose a fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act;**

iii. **Fail to disclose to the tribunal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel;**

iv. **Use or offer evidence that the lawyer knows to be false;**

53. Rule 3.03 mandates that PACHECO AND DAVIS disclose controlling authority in

this jurisdiction and not assist their client with any criminal or fraudulent act, yet DEFENDANTS have acted in concert, taking knowingly frivolous positions by distorting the law. One example is the false accusation that SCHWAGER has violated Texas Rule of Disciplinary Procedure 3.07, 4.01 or the preamble. *See the Texas Supreme Court's decision in Davenport v. Garcia, 5th Circuit decision of United States of America v. Donald Hill, and Gentile v. State Bar of Nev.*, 501 U.S. 1030 (1991), incorporated by reference. *See also Texas Disciplinary Rule of Professional Conduct 3.07, 4.01 and referenced preamble.* Aside from the limited ability of Courts to impose "gag orders,"

54. Rule 3.07 is by no means a blanket prohibition on pre-trial publicity or disclosure of testimony/evidence in Court proceedings. To do so would unambiguously violate Art. I Section 13 of the Texas Constitution, guaranteeing that Courts of the State of Texas be open to the public. Rule 3.7 permits protective orders ("gag orders") in only the most high profile cases—which are almost exclusively criminal proceedings, where disclosure of *knowingly false, inadmissible evidence* substantially endangers the DEFENDANT'S right to a fair trial. The 6th Amendment guarantee of a fair trial applies only to criminal matters. This leaves no basis exists for sanctions or contempt. Rule 3.07 states:

(a) In the course of representing a client, a lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that *it will have asubstantial likelihood of materially prejudicing an adjudicatory proceeding.* A lawyer shall not counsel or assist another person to make such a statement (emphasis added). A lawyer ordinarily will violate paragraph (a), and the likelihood of a violation increases if the adjudication is ongoing or imminent, by making an

Silverado Appx. 0557

extrajudicial statement of the type referred to in that paragraph when the statement refers to:

(1) the character, credibility, reputation or criminal record of a party, suspect in a criminal investigation or witness; or the expected testimony of a party or witness;

(2) in a criminal case or proceeding that could result in incarceration, the possibility of a plea of guilty to the offense; the existence or contents of any confession, admission, or statement given by a defendant or suspect; or that person's refusal or failure to make a statement;

(3) the performance, refusal to perform, or results of any examination or test; the refusal or failure of a person to allow or submit to an examination or test; or the identity or nature of physical evidence expected to be presented;

(4) any opinion as to the guilt or innocence of a defendant or suspect in a criminal case or proceeding that could result in incarceration; or

(5) information the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and would if disclosed create a substantial risk of prejudicing an impartial trial.

(b) A lawyer ordinarily will not violate paragraph (a) by making an extrajudicial statement of the type referred to in that paragraph when the lawyer merely states:

(1) the general nature of the claim or defense;

(2) the information contained in a public record;

Silverado Appx. 0558

(3) that an investigation of the matter is in progress, including the general scope of the investigation, the offense, claim or defense involved;

(4) except when prohibited by law, the identity of the persons involved in the matter;

(5) the scheduling or result of any step in litigation;

(6) a request for assistance in obtaining evidence, and information necessary thereto;

(7) a warning of danger concerning the behavior of a person involved, when there is a reason to believe that there exists the likelihood of substantial harm to an individual or to the public interest; and

(8) if a criminal case:

> (I) the identity, residence, occupation and family status of the accused;
>
> (ii) if the accused has not been apprehended, information necessary to aid in apprehension of that person;
>
> (iii) the fact, time and place of arrest; and
>
> (iv) the identity of investigating and arresting officers or agencies and the length of the investigation.

55. The Statements of which DEFENDANTS' COUNSEL complains are frivolous given that this is a guardianship case, not a criminal matter. The First Amendment and Article I Section 8 Right to free speech and freedom of the press cannot be subject to prior restraints under the circumstances. The Seminole Texas Supreme Court case governing gag orders involved children and held that a "gag order" violated the Texas Constitution. *Davenport v. Garcia, incorporated by reference. This* opinion emphasizes the greater protections by the Texas Constitution over the 1st Amendment to the U.S. Constitution. Id.

55. In *Davenport v. Garcia*, the Court held that: "A prior restraint on expression is presumptively unconstitutional. With this concept in mind, the court adopts the following test: a gag order in civil judicial proceedings will withstand constitutional scrutiny only where there are specific findings supported by evidence that (1) an imminent and irreparable harm to the judicial process will deprive litigants of a just resolution of their dispute, and (2) the judicial action represents the least restrictive means to prevent that harm." The Court reasoned that "Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege," stating that Article I Section 8's history "is a rich one, and its language demonstrates Texas' strong and longstanding commitment to free speech. By the plain language of our constitution, this fundamental liberty 'shall forever remain inviolate.' *Tex. Const. art. I, β 29.*

56. Due to the protections of the ADA, Texas Anti-SLAPP Statute, Texas Constitution, Art. I Section 8[19], and First Amendment to the United States Constitution, the only cases nationwide where a bar association was able to censure an Attorney for speech involved extensive pre-Trial publicity and attacks on the judiciary. *Gentile v. State Bar of Nev.,* 501 U.S. 1030 (1991). The First Amendment to the United States Constitution has stated since its ratification in 1791: "Congress shall make no law. . . abridging the freedom of speech, or of the press. The First Amendment's free speech clause, includes written expression as well as spoken. *Barnes v. Glen Theatre, Inc.* (1991) 501 U.S. 560, 576 [111 S. Ct. 2456, 2465-2466, 115 L. Ed. 2d 504] (conc. opn. of Scalia, J.); see, e.g., *Dallas v. Stanglin* (1989) 490 U.S. 19, 25 [109 S. Ct. 1591, 1595, 104 L. Ed. 2d 18].) In *Polk v. State Bar of Texas,* Polk successfully enjoined the Texas State Bar from chilling his speech, even though he was critical of a District Attorney and Judge—suggesting corruption. 374 F. Supp. 784 (N.D. Tex. 1974).

Silverado Appx. 0560

57. The Court agreed, "an Attorney's speech could not be reprimanded by the Texas State Bar because of objection to content." Id. In fact, the Court stated "**It cannot be seriously asserted that a private citizen surrenders his right to freedom of expression when he becomes a licensed attorney in this state.**" The Supreme Court has built a substantial line of cases where the Constitution has been read to limit and restrain the state's power to prescribe standards of conduct for attorneys. NAACP v. Button, 371 U.S. 415, 83 S. Ct. 328, 9 L. Ed. 2d 405 (1963); Konigsberg v. State **Bar** of California, 353 U.S. 252, 77 S. Ct. 722, 1 L. Ed. 2d 810

In *Davenport v. Garcia*, the Supreme Court of Texas stated, "We are fully aware that a prior restraint will withstand scrutiny under this test only under the most extraordinary circumstances. That result is consistent with the mandate of our constitution recognizing our broad right to freedom of expression in Texas. An individual's rights under the state constitution do not end at the courthouse door; rather, the courthouse is properly the fortress of those rights. The first requirement of our standard advances from the prior holdings of Texas courts that only an imminent, severe harm can justify prior restraint, and in the context of gag orders, that harm must be to the judicial process. *Ex Parte McCormick, 129 Tex. Crim. 457, 88 S.W.2d 104; Ex Parte Foster, 71 S.W. at 595.* The mandate that findings of irreparable harm be made is based on our state constitutional preference for post-speech remedies. Only when no such meaningful remedies exist will prior restraints be tolerated in this context. The second part of the test is intended to ensure that no alternative exists to treat the specific threat to the judicial process, which would be less restrictive of state speech rights. While this element is shared in common with the ruling in *Nebraska Press, 427 U.S. at 563-64*, we view the federal test announced therein as too permissive toward prior restraints and decline to adopt it. The federal approach offers only limited guidance concerning gag orders such as that involved here, which restrict access to information by prohibiting individuals from discussing a case. Such orders should be treated like

Silverado Appx. 0561

any other prior restraint. The only other factors to he considered under *Nebraska Press* are the extent of pretrial news coverage and the effectiveness of the restraining order. We note that to the extent that this opinion cites any federal law, such precedent is used only for guidance and in no way necessitates the result reached by this court today. That standard has been largely developed in the context of criminal rather than civil proceedings, weighing the press' First Amendment rights against an accused's Sixth Amendment right to a fair trial. *See* Sheryl A. Bjork, Comment, *Indirect Gag Orders and the Doctrine of Prior Restraint, 44 U. Miami L. Rev. 165, 166 (1989)*. For instance, the first element in this test, the extent of pretrial news coverage has little bearing on a civil proceeding. *Nebraska Press,* a splintered decision with five separate opinions, has been appropriately criticized for failing to provide a comprehensive guarantee of free expression. *See* Stephen R. Barnett, *The Puzzle of Prior Restraint,* 29 Stan. L. Rev. 539, 541 (1977); Benno C. Schmidt, Jr., *Nebraska Press Association: An Expansion of Freedom and Contraction of Theory,* 29 Stan. L. Rev. 431, 461 (1977)."

In deference to Texas' categorical prohibition upon restrictions of speech, the Court further states that "[n]either *Nebraska Press* nor any other ruling of the United States Supreme Court has specifically considered such an order. Indeed, there is a confusing split of federal authority on this matter. *See In re Dow Jones, 842 F.2d 603, 608-10* (2d. Cir.), *cert. denied, sub nom. Dow Jones & Co., Inc. v. Simon, 488 U.S. 946, 102 L. Ed. 2d 365, 109 S. Ct. 377 (1988)* (gag orders on trial participants are subject to a lesser degree of scrutiny than are prior restraints); *In re Russell, 726 F.2d 1007, 1010 (4th Cir. 1984)* (relying on *Nebraska Press* to uphold a gag order on trial participants); *but see Journal Publishing Co. v. Mechem, 801 F.2d 1233, 1236* (10th Cir. 986) (gag orders on trial participants constitute prior restraint)." The end result has been a lack of uniformity in lower Courts with the U.S. Supreme Court striking down every gag order that was remotely deemed a prior restraint upon speech.

58. Texas Supreme Court ruled that the "gag order" was undoubtedly in violation of Article One, Section Eight of the Texas Constitution. It failed to identify any miscommunication that the jury may have perceived, lacked specific proof of imminent harm to the litigation, and offered no explanation of why the alleged harm could not be sufficiently addressed by remedial action. Gag orders are almost without exception unconstitutional in civil cases unless the matter is sealed in accordance with strict constitutional mandates of Article I Section 13 and Texas Rule of Civil Procedure 76a. Sealing has historically been limited to sensitive cases involving juveniles and adoptions.

59. Even in the criminal context, not all high profile cases justify the imposition of a "gag order." While the 14th Court of Appeals granted a "gag order" in the *Andrea Yates trial*, it was denied in *O.J. Simpson's criminal trial* and countless other criminal cases deemed sensitive or high profile. In a county of more than 4,000,000 people, it is impossible to conceive of a scenario in which the Court would be incapable of finding 6-12 jurors who had not read SCHWAGER'S blog, FACEBOOK page, or the few online articles written by the American Bar Journal, Senior Housing News, Long Term Living Magazine, the Examiner, the Southeast Texas Record, or other insignificant internet venues. *See articles concerning policy considerations and debates in the long term care community over social media as a result of Silverado's actions.*

60. The constitutional protections of free speech and press were fashioned to assure the unfettered interchange of ideas for bringing about political and social changes desired by the people. New York Times Co. v. Sullivan, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). "All ideas having even the slightest redeeming social importance -- unorthodox ideas,

controversial ideas, even ideas hateful to the prevailing climate of opinion" -- fall within the full protection of the First Amendment. Roth v. United States, 354 U.S. 476, 484, 77 S. Ct. 1304, 1 L. Ed. 2d 1498 (1957). Legislation or Rules that aim at penalizing the publication of truthful information can seldom satisfy constitutional standards, Smith v. Butterworth, 866 F.2d 1318, 1320 (11th Cir. 1989), cert. granted, 493 U.S. 807, 110 S. Ct. 46, 107 L. Ed. 2d 16 (1989), and is generally presumed unconstitutional.

61.    Aside from the greater protections afforded by the Texas Constitution, the U.S. Supreme Court has long held that political speech about government issues or officials is "at the core of what the First Amendment is designed to protect." Morse v. Frederick, 127 S. Ct. 2618, 2626, 168 L. Ed. 2d 290 (U.S. 2007)(citation omitted). There is universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. Mills v. Alabama, 384 U.S. 214, 218, 86 S. Ct. 1434, 16 L. Ed. 2d 484 (1966). The Supreme Court has long held that regulations enacted for the purpose of restraining speech on the basis of content are presumptively violative of the First Amendment, Renton v. Playtime Theatres, Inc., 475 U.S. 41, 46-47, 106 S. Ct. 925, 89 L. Ed. 2d 29 (1986). The entirety of MOVANTS' frivolous MOTIONS FOR SANCTIONS aims to punish core political speech on matters of public concern protected by Constitutional and Statutory including but not limited to Article I, Section 8, the First Amendment, the Texas Citizens' Participation Act, Title II and III of the Americans with Disabilities Act of 1990, the Elder Justice Act, 18 U.S.C. 241, 18 U.S.C. 242, 42 U.S.C. 1983, and federal and state abuse, neglect, and/or exploitation statutes which prohibit retaliation. This is aside from the fact that MOVANTS have failed to demonstrate falsity of any statement made by SCHWAGER, prejudice to the judicial process, compliance with Constitutional mandates upon the scope of such restrictions, or actual malice for public figures.

Silverado Appx. 0564

Rule 3.04 Fairness in Adjudicatory Proceedings

    a.  **...in representing a client before a tribunal, [the lawyer shall not]**

        i.  **habitually violate an established rule of procedure**

        ii.  **state or allude to any matter that the lawyer does not reasonably believe is relevant to such proceeding or that will not be supported by admissible evidence...**

        iii.  **ask any question intended to degrade a witness or other person except where the lawyer reasonably believes that the question will lead to relevant and admissible evidence...**

**Rule 3.05 Maintaining the impartiality of the tribunal**

    b.  **A lawyer shall not:**

        i.  **Seek to influence a tribunal concerning a pending matter by applicable rules of practice or procedure, communicate or cause another to communicate ex parte with the tribunal for the purpose of influencing that entity or person concerning a pending matter...**

33

62. Likewise, PACHECO AND DAVIS' improper attempts to inflame this Honorable Judge with false accusations and improper, degrading, defamatory statements, known to be inadmissible violates Rule 3.05.

**Rule 4.01 Truthfulness in Statements to others**

    a.  **In the course of representing a client a lawyer shall not knowingly;**

        i.  **Make a false statement of material fact or law to a third person; or**

        ii.  **Fail to disclose a material fact to a third person when disclosure is necessary to avoid making the lawyer a party to a criminal act or knowingly assisting in a fraudulent act perpetrated by a client;**

Silverado Appx. 0565

61. JOSH DAVIS has misrepresented many facts before this tribunal, the most egregious of which is the knowingly frivolous assertion of SILVERADO'S feigned concern for the privacy rights of its residents, RUBY PETERSON, or employees, while exploiting them in advertising throughout social media, the internet, and Youtube. PLAINTIFFS downloaded more than 20 Youtube videos exploiting dementia patients who had no capacity to consent to being used for SILVERADO'S advertising. TANNA MCMILLAN testified that upon entering or commencing work at SILVERADO, residents and employees waive privacy rights so that SILVERADO can use them in commercial advertising and marketing.

62. SILVERADO'S lack of regard for RUBY PETERSON'S privacy rights in refusing to permit RUBY to visit with her sons in private, denying access to phone calls, screening or failing to deliver mail, as well as the assaultive shower incident RUBY speaks of in thevideo SILVERADO finds so objectionable. SILVERADO'S concern is MONEY Silverado's Senior Vice President prepared the attached presentation on how critical social media is to its marketing and profit margins. Notably, the presentation states that baby boomers use Facebook more than any other media at a rate of 80-90%. While Davis would have this Court to believe that SCHWAGER'S protected advocacy and core political speech on Facebook is an isolated event for which punishment should ensue, a federal lawsuit on file in the Southern District of Texas Court includes a form "Facebook Subpoena." *See Silverado Senior Living's exploitive marketing* . This demonstrates that Silverado's monitoring of objectionable "content" on Facebook is a regular practice used to intimidate others with legitimate complaints against them.

Silverado Appx. 0566

No. 1-15-567-CV 1655

**Rule 4.04 Respect for the Rights of third persons**

a. A lawyer shall not present, participate in presenting, or threaten to present:

  i. Criminal or disciplinary charges solely to gain an advantage in a civil matter or

  ii. Civil, criminal, or disciplinary charges against a complainant, a witness, or a potential witness in a bar disciplinary proceeding solely to prevent participation by the complainant, witness, or potential witness therein.

63. As stated herein, PACHECO AND DAVIS have violated Rule 4.04 by threatening sanctions, contempt, arrest, and trespass, violating the Constitutional rights of PLAINTIFFS and their ATTORNEYS solely to gain an advantage in this proceeding. Where an attorney has no legal basis to threaten action or does so in bad faith, the only rational conclusion is the threats were made solely to gain an advantage, in violation of Rule 4.04. VIOLATIONS OF RULE 10, 13 and/or 215

64. To impose sanctions under Rule 13, the proponent must establish that the SUIT WAS GROUNDLESS and brought (1) in bad faith or (2) for the purposes of harassment. Tex. R. Civ. P. 13. A pleading is groundless when it has no basis in factor law. Rule 13. The burden is on the party moving for sanctions to overcome the presumption that the pleading was filed in good faith. GTE Comm'ny Sys. Corp v. Tanner, 856 S.W.2d 725, 731 (Tex. 1993). Bad faith means the "conscious doing of a wrong for dishonest, discriminatory, or malicious purposes." Campos, 879 S.W.2d at 71; Mattly v. Spiegel, Inc.; 19 S.W.3d 890, 896 (Tex. App.—Houston [14th Dist] 2000, no pet). In deciding whether a pleading was filed in bad faith or for purposes of harassment, the trial court must measure a litigant's conduct at the time the relevant pleading was

Silverado Appx. 0567

filed. Texas-Ohio Gas,Inc. v. Mecom, 28 S.W.3d 129, 139 (Tex. App—Texarkana 2000, no pet). Texas law requires the Court examine not just objectively, but examine subjectively the motives and credibility of the attorney who signed the petition. No finding was ever made that Schwager lacked credibility subjectively or had a malicious improper intent. Rule 13 requires that the Judge look beyond the merits of the pleading to the intent (as best s they can discern) of the signing attorney. Improper motive is an ESSENTIAL ELEMENT of BAD FAITH. Parker v. Walton, 233 S.W.3d 535, 539 (Tex. App.— Houston [14th Dist.] 2007, no pet.). Alejandro v. Bell, 84 S.W.3d 383, 393 (Tex. App.— Corpus Christi 2002). Rule 10 Sanctions require that it be proven that (1) the pleading or motion was brought for an improper purpose, (2) there were no grounds for the legal arguments advanced, or the factual allegations or denials lacked evidentiary support; See Tex. Civ. Prac. & Rem. Code Ann. § 10.001 (Vernon 2002); Low, 221 S.W.3d at 614; Armstrong v. Collin County Bail Bond Bd., 233 S.W.3d 57, 62 (Tex. App.— Dallas 2007, no pet.). Chapter 10 specifies that one of the aims for imposition of sanctions for the filing of frivolous or groundless pleadings is to "deter repetition of the conduct or comparable conduct by others similarly situated." Tex. Civ. Prac. & Rem. Code Ann. § 10.004(b) (Vernon 2002). We construe the phrase "improper purpose" as the equivalent of "bad faith" under Rule 13. See Tex. R. Civ. P. 13;cf. Save Our Springs Alliance, Lazy Nine Mun. Util. Dist. ex rel. Bd. of Directors, 198 S.W.3d 300, 321 (Tex. App. Texarkana 2006, pet. denied) ("non-frivolous" requirement is same as "good faith" requirement); Elwell v. Mayfield, No. 10-04-00322-CV, 2005 WL 1907126, at *5 (Tex. App.—Waco Aug. 10, 2005, pet. denied) (mem. op.) (same). An order imposing a sanction under Chapter 10 "shall describe . . . the conduct the court has determined violated Section 10.001 and explain the basis for the sanction imposed." Tex. Civ. Rem Code. 10.001. In determining whether sanctions are appropriate, the trial court must examine facts available to the litigant and the circumstances existing when the litigant

filed the pleading. Robson v. Gilbreath, 267 S.W.3d 401, 405 (Tex. App.—Austin 2008, pet. denied); Alejandro v. Robstown Indep. Sch. Dist., 131 S.W.3d 663, 669 (Tex. App.—Corpus Christi 2004, no pet.). Courts should **presume parties and their counsel file all papers in good faith, and the party seeking sanctions must overcome that presumption.** See Tex. R. Civ. P. 13; GTE Commc'ns Sys. Corp. v. Tanner, 856 S.W.2d 725, 731 (Tex. 1993). The party seeking sanctions has the burden of showing its right to relief. Tanner, 856 S.W.2d at 731; Elkins v. Stotts-Brown, 103 S.W.3d 664, 668 (Tex. App.—Dallas2003, no pet.).

65.    Chapter 10 provides that: The signing of a pleading or motion constitutes a certificate by the signatory that to the signatory's best knowledge, information, and belief, formed after reasonable inquiry: (1) the pleading or motion is not being presented for any improper purpose, including to harass or to cause unnecessary delay or needless increase in the cost of litigation; (2) the claims, defenses, or other legal contentions in the pleading or motion is warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; (3) the allegations or other factual contentions in the pleading or motion have evidentiary support or, for a specifically identified allegation or factual contention, is likely to have evidentiary support after a reasonable opportunity for further investigation discovery...Id. (emphasis added). Both Rules 10 and Rule 13 require proof of improper purpose, malicious intent, intent to harass or increase the costs of litigation,. Tex. R. Civ. P. 13, 10. No proof of harassment or malice exists or can be shown. Sanctions may be only imposed for good cause under Rule 13 the particulars of which must be stated in the order. Tex .R. Civ. P. 13; Rudisell, 89 S.W.3d at327. At no time has counsel PROVED to the standard required that any pleadings were filed by PLAINTIFFS or their ATTORNEYS with the intent to harass, mislead, increase the costs of litigation, or in bad faith. Counsel has filed every pleading in good faith and in reliance on the Constitutions of the United States, Texas, Federal and State Statute,

Silverado Appx. 0569

Ethical Rules, and/or procedural rules of this Court. MOVANTS have the burden of proving some form of malicious intent, which they patently cannot. Tex. R. Civ. P 10, 13. SCHWAGER has sent the lawsuits filed in this case to the Texas Department of Aging and Disability (DADS), Texas Attorney General Elder Abuse and Exploitation Unit Captain (investigation pending), Department of Justice (investigation pending), and Police Department. SCHWAGER would hardly commit a crime or engage in sanctionable conduct given the penalties imposed for doing so. SANCTIONS are only justified in the following scenarios: Attorneys not reading the pleading, Not conducting adequate investigation into the facts, Groundless and brought in bad faith, Groundless and brought to needlessly increase the cost of litigation; or Statements known to be false. MOVANTS are unable to provide anything beyond speculative conjecture of any of the foregoing because the evidence simply does not exist to support their malicious, illegal MOTIONS. Notably, none of the foregoing factors were established to counter Schwager's presumption of good faith, such that sanctions are not authorized under Rule 10 or 13. Rule 13 authorizes the imposition of sanctions against an attorney, who filed a pleading is either: (1) groundless and brought in bad faith; or (2) g 33, 236 (Tex. App.—CorpusChristi 2002, no pet.).

The rule defines "groundless" as groundless and brought to harass. Tex. R. Civ. P. 13; see also Rudisell v. Paquette, 89 S.W.3d 233, 236 (Tex. App.—Corpus Christi 2002, no pet). having "no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law." Tex. R. Civ. P. 13. It is MOVANTS whose pleadings meet this standard, not PLAINTIFFS or their ATTORNEYS. With respect to Rule 215, the Rule pertains exclusively to discovery abuse. Given that the PARTIES have just begun discovery, there are clearly no grounds upon which to allege that PLAINTIFFS or their ATTORNEYS violated Rule 215. Tex. R. Civ. P. 215. To the Contrary, JOSH DAVIS' overly broad, harassing subpoena violates Rule 215, much like his other frivolous, dishonest, retaliatory conduct.

Silverado Appx. 0570

with clean hands. Breaux v. Allied Bank, 699 S.W.2d 599, 604 (Tex. App.--Houston [14th Dist.] 1985, writ ref'd n.r.e.). The clean-hands doctrine is A[t]he principle that a party cannot seek equitable relief or assert an equitable defense if that party had violated an equitable principle, such as good faith. . . Such party is described as having unclean hands. Sanctions and fees have been denied where the party seeking them lacked "clean hands" such as evidence of impropriety or bad faith on their part., 174 F.R.D. 319, 326 (S.D.N.Y. 1997). A party who seeks equity must do equity. Furr v. Hall, 553 S.W.2d 666, 672 (Tex. Civ. App. Amarillo 1977, writ refd n.r.e.); Ligon v. E.F. Hutton & Co., 428 S.W.2d 434, 437 (Tex. Civ. App.Dallas 1968, writ ref'd n.r.e.). Sanctions may not be arbitrary or capricious, as in this case—when one considers the landscape of the hearing and multiple instances of misconduct and misrepresentations of other attorneys, as has been made clear by multiple motions filed by APPLICANTS. Blanket conclusory statements are insufficient to support a sanctions award under Rule 10 or 13 without EVIDENCE (subjective and objective) proving that the "pleading" was groundless and filed with malicious or improper intent. They cannot do this because no such evidence exists. For the foregoing reasons, no sanctions can be awarded under Rules 10, 13, or 215. Instead the Court should assess sanctions against SARAH PACHECO, JOSH DAVIS AND RUSS JONES as well as their clients (absent RUBY PETERSON) for violating these rules as well as the Texas Rules of Disciplinary Conduct as stated herein.

**V. CONCLUSION AND PRAYER**

PLAINTIFFS AND THEIR ATTORNEYS respectfully request this Honorable Judge MODIFY THE ORDERS ISSUED NOVEMBER 10, 2014, dismissing PLAINTIFFS' claims against SILVERADO SENIOR LIVING or otherwise under Rule 91a or Motions to Dismiss, and rescind all sanctions orders whether issued pursuant to Rule 10, 13 or Rule 3.7. MOVANTS request all other relief to which they may be justly entitled.

Respectfully submitted,

/s/ *Candice L. Schwager*
Candice L. Schwager 1417 Ramada Dr.
Houston, Texas 77062
Tel: (832) 315-8489
Fax: (713) 583-0355
schwagerlawfirm@live.com
**ATTORNEYS FOR MACK
GLEN PETERSON, LONNY
PETERSON, AND DON
LESLIE PETERSON**

## Certificate of Service

I hereby certify that a true and correct copy of the above document was e-filed and sent by email or electronic delivery by agreement to the following on the 6th day of February 2015:

Sarah Pacheco
Kathleen Beduze
Crain, Caton & James, PC
1401 McKinney St., Suite 1700
Houston, TX 77010

Russ Jones
Underwood, Jones, Scherrer &
Malouf, PLLC
5177 Richmond Ave., Suite 505
Houston, TX 77056

Jill Young
MacIntyre, McCulloch, Stanfield, Young, LLP
2900 Weslayan, Suite 150
Houston, TX 77027

Josh Davis
Lewis Brisbois Bisgaard & Smith, LLP
Weslayan Tower, Suite 1400
24 Greenway Plaza
Houston, TX 77046

/s/ *Candice Schwager*
Candice Schwager

Silverado Appx. 0572